RHOADS DRILLING COMPANY ET AL V. JAMES V. ALLRED, ATTORNEY GENERAL OF TEXAS.

No. 6609.   Decided April 18, 1934
(70 S. W., 2d Series, 576.)

*Black & Graves,* of Austin, *Rice M. Tilley* and *Harry P. Brelsford,* of Fort Worth, *Davidson, Blalock & Blalock,* of Marshall, *Renfro, Ledbetter & McCombs,* and *Locke, Locke, Stroud & Randolph,* of Dallas, for relators.

The contract does not contravene the statute in securing for the State beneficial stipulations not expressly mentioned in the statutes. Lewright v. Bell, Atty Gen., 94 Texas, 556, 63 S. W., 623; Bodenheim v. Lightfoot, Atty Gen., 103 Texas, 639, 132 S. W., 468; Munson v. Looney, Atty Gen., 107 Texas, 263,

172 S. W., 1102; Dallas County Levee Dist No. 2 v. Looney, Atty. Gen., 109 Texas, 326, 207 S. W., 310; City of Aransas Pass. v. Keeling, Atty. Gen., 112 Texas, 339, 247 S. W., 818; Tom Green County v. Moody, Atty. Gen., 116 Texas, 299, 289 S. W., 381; Tarrant County Water Control & Impr. Dist. No. 1 v. Pollard, Atty. Gen., 118 Texas, 138, 12 S. W. (2d) 137; Rogan v. Bobbitt, Atty. Gen., 119 Texas, 347, 29 S. W. (2d) 321; Henderson County v. Allred, Atty. Gen., 120 Texas, 483, 40 S. W. (2d) 17.

The statute does not sanction a gratuity or a gratuitious release or extinguishment of an obligation, in contravention of any one or more of Sections 44, 51, 53 and 55 of Art. 3 of the Constitution of Texas. Byrd v. City of Dallas, 6 S. W. (2d) 738; Waggoner v. Wise County, 17 Texas Civ. Ap., 220, 43 S. W. 836; Delta County v. Blackburn, 100 Texas, 51, 93 S. W., 419; Rhodes v. Twing, 41 S. W. (2d) 13; Morris v. City of Conroe, 47 S. W. (2d) 690; State v. Bradford, 121 Texas, 515, 50 S. W. (2d) 1065; Jones v. Williams, 121 Texas, 94, 45 S. W. (2d) 130.

*James V. Allred*, Attorney General, *Homer C. DeWolfe*, Assistant Attorney General, for respondents.

The Act of the 43rd Legislature, ch. 120, S. B. 203, in so far as it attempts to grant authority to the Board of Mineral Development to revise leases and contracts theretofore executed necessarily decreasing the consideration moving to the State, in consideration of lessees agreeing to abide by the consideration, laws, orders, rules and regulations with reference to the development of petroleum or natural gas bearing land, is in violation of Sections 44, 51, 53 and 55 of Article 3 of the Constitution of Texas, and to this extent is unconstitutional and void. Delta County v. Blackburn, 100 Texas, 51, 93 S. W., 419; Empire Gas & Fuel Co. v. State, 121 Texas, 138, 47 S. W. (2d) 265; Judkins v. Robison, 109 Texas, 6, 160 S. W., 955; Danciger Oil and Ref. Co. v. Railroad Commission, 49 S. W. (2d) 841; 12 C. J., 991, par. 603.

The agreements contained in said modificatory contract on the part of lessees, Rhoads Drilling Company, fail individually and collectively to state an adequate consideration with which to support the modificatory contract because by each and all of these agreements relators promised to do and perform no more than they were already bound and obligated to do and perform under their original contract and the laws of this State. Thus on Oil & Gas, secs. 128-131, and cases cited; Thornton Oil & Gas, Vol. 1, secs. 154-157; W. T. Waggoner

Estate v. Sigler Oil Co., 118 Texas, 509, 19 S. W. (2d) 27; Texas Co. v. Davis, 113 Texas, 321, 254 S. W., 304, 255 S. W., 601.

If the court should hold this law a valid law and require respondent to approve the same, then respondent submits that said leases and contracts can operate only prospectively from the date of approval by the Attorney General as to their form and legality and their delivery to the Board of Mineral Development after said approval. That in addition thereto and as part of this proposition, that said modificatory contracts cannot become operative until after the actual approval of the Attorney General and can operate only from that date because said modificatory contract has not been delivered to relators nor was there any intention on the part of the Board of Mineral Development that there should be a delivery of said contract until after the same had been approved by the Attorney General. Wheeler & Wilson Mfg. Co. v. Briggs, 18 S. W., 555; Ligon v. Wharton, 120 S. W., 930; Schmidt v. Baar, 283 S. W., 115; James v. Tubbs, 53 S. W. (2d) 106.

MR. JUDGE SMEDLEY delivered the opinion of the Commission of Appeals, Section B.

Relators are the owners of all of the rights of the lessees under three oil and gas leases executed on June 18, 1932, by the State of Texas as lessor, acting through its Board of Mineral Development pursuant to Chapter 40 of the General Laws of the 42nd Legislature (page 64), enacted at its Second Called Session, in so far as said leases cover and pertain to three tracts in the bed of the Sabine River in Gregg County, known as Tract No. 4, Tract No. 5, and the East or lower part of Tract No. 7, aggregating 203 acres. They seek the issuance of a writ of mandamus to compel the Respondent, the Attorney General, to approve as to legality and form a contract supplementing or modifying the leases, which contract was executed by relators and the Board of Mineral Development on July 1, 1933, pursuant to Chapter 120 of the General Laws passed at the Regular Session of the 43rd Legislature (page 309), amending Chapter 40 above referred to.

Respondent refused to approve the supplemental or modificatory contract because he entertained a doubt concerning the constitutionality of Chapter 120, and also a doubt whether the terms of the contract conformed to the provisions of the Act. In all other respects respondent found the contract to be legal and in proper form.

Respondent's contentions, which are ably and thoroughly presented, briefly stated, are:

First, that Chapter 120 is unconstitutional, being in violation of Sections 44, 51, 53 and 55 of Article III of the Constitution, because it attempts to grant authority to the Board of Mineral Development to revise leases and contracts theretofore executed by decreasing the consideration moving to the State in consideration of lessee's agreement to abide by the valid conservation laws, orders, rules and regulations with reference to the development of petroleum or gas bearing land;

Second, that the contract is void because the Board of Mineral Development was without authority under Chapter 40 to enter into a modificatory contract and because the purported consideration expressed therein moving to the State, not being authorized by Chapter 120, will not sustain the validity of the contract;

Third, that the agreements contained in the contract on the part of the lessees fail individually and collectively to state an adequate consideration to support the contract because by such agreemnts lessees promised to do no more than they were already bound to do under the leases and the laws of this State.

The case therefore involves both the construction and the constitutionality of Chapter 120, as well as the construction of the supplemental contract. The act of the Legislature must be construed before its constitutionality can be determined, and it must be construed in the light of the act which it amends. The supplemental or modificatory contract is to be construed in the light of the two acts of the Legislature, and in the light of the leases which it supplements or modifies.

Chapter 40 created a Board of Mineral Development composed of the Governor, the Commissioner of the General Land Office, and the Chairman of the Railroad Commission, and authorized it, after advertisement and receipt of bids, to accept bids deemed by the Board to be to the best interest of the State, and to enter into leases or contracts with successful bidders for the development for oil and gas of river beds owned by the State and situated not more than two miles from a well producing or capable of producing oil or gas in paying quantities. The contracts and leases are required to be on forms approved by the Attorney General and are to be approved by him also as to legality. The Board is required to reserve to the State in any contract to lease a river bed area at least one-eighth interest or royalty. Aside from this and a requirement of proper safeguards against pollution of the stream, the act does not undertake to fix or provide the terms, conditions or

considerations of the contracts and leases, but very clearly undertakes to leave them to the judgment and discretion of the Board. The act is silent on the subject of making supplemental or modificatory contracts.

Under Chapter 40 the Board of Mineral Development on June 18, 1932 ,executed to two of the relators (the other relator later acquiring an interest by assignment) three separate oil and gas leases, identical in their terms, covering tracts 4, 5 and 7 respectively, of the bed of the Sabine River in Gregg County. These leases, which are for a term of two years and as long thereafter as oil or gas is produced in paying quantities, provide for the delivery to the State as royalty of the equal 3/8 part of the oil produced and saved and for the delivery to the State as royalty of the equal 3/8 part of all gas produced and saved, or at the option of the State the payment to it of the value of the 3/8 part of the gas. The leases require the lessee, in addition to said royalty, to deliver to the lessor 1/16 part of all oil and gas produced and saved from each well until the lessor has received the sum of $5,125 as proceeds from said 1/16 part from such well, or at the option of lessor until oil or gas of the market value of $5,125 has been so delivered to lessor from such 1/16 part.

The leases in their paragraph numbered 6 provide in general terms that the lessee shall reasonably develop the premises so as adequately to protect the oil and gas from drainage.

By paragraph 7 of each lease the lessee is required to drill an offset well or wells whenever production in commercial quantities is begun from any well within 1000 feet of any of the area included in the lease, with the provision, however, that in any event the lessee shall be deemed to be complying with the requirements of this paragraph so long as it is in good faith prosecuting the drilling of at least two wells on such tract when required by the provisions of the lease. It is declared in this paragraph that the prevention of the drainage of the leased premises and recovery of the oil and gas lying within the same are of the essence of the instrument, and the lease is made subject to forfeiture for non-compliance with the provisions of this paragraph and the preceding paragraph. By paragraph 8 it is provided that in no event shall lessees be required to drill wells on the premises closer than 660 feet apart.

Paragraph 17 prohibits the lessee from removing casing or any part of the equipment of any producing well located upon the premises if the lease terminates or is forfeited for any cause. It is further provided by this section that "lessee shall in no event be required to continue the operation of any well

after the production therefrom has decreased to such an extent that the income derived by lessee is insufficient to pay the actual cost of operation, in which event lessee may at its option abandon said well, and with the written consent of the Board of Mineral Development remove all machinery and fixtures, including the casing in the well."

Paragraph 20 gives the lessee the right of surrender in the following language:

"All rights to the area covered by this lease, and to any portion thereof may be relinquished to the State at any time by having a legally sufficient instrument or relinquishment recorded in the County or Counties in which the area may be situated, and filed in the Land Office, accompanied by One and No/100ths ($1.00) Dollars for each instrument of relinquishment, but such relinquishment shall not relieve the owner of any past due obligations theretofore accrued thereon. The above mentioned assignment and relinquishment fees shall be paid to the Commissioner of the General Land Office at Austin, Texas."

It is expressly stated in another paragraph that he instrument is not a conveyance of the oil and gas in place, the intention being that the lessee shall acquire title to oil or gas only as and when produced.

The lease contains many other terms and conditions, but they do not appear to be of importance in determining the questions presented for decision.

Chapter 120, Acts of the Regular Session of the 43rd Legislature (1933) amends Chapter 40 hereinbefore discussed, enacted in 1931, by adding to that law Subsections 6a and 6b. Subsection 6a declares that as to each lease or contract hereafter made by the Board of Mineral Development it shall be the policy of the State with reference to the development of river beds that all lessees or contracting parties shall conform to the valid laws of the State and to the valid orders, rules and regulations of any agency of the State applicable to the development by others than the State of petroleum or gas bearing land, and that each lease or contract hereafter made by the Board shall be subject thereto. Subsection 6b is as follows:

"As to any and each lease and/or contract heretofore made by the Board of Mineral Development, such Board shall be, and it is hereby, authorized and empowered to revise the same, with the consent of the lessees and/or contracting parties thereunder, their heirs, successors or assigns, in such wise as to subject such lease and/or contract thenceforth to the public policy declared in Subsection 6a. Such revision shall be accomplished

by supplemental or modificatory instrument on such terms as the Board of Mineral Development may deem fair and advantageous to this State, but only after a proposal for such revision shall be formally made, in a public document, to the said Board of Mineral Development, by the lessees and/or contracting parties under such lease and/or contract, their heirs, successors ar assigns; and provided that in consideration of the consent by such lessees and/or contracting parties, their heirs, successors or assigns, to such revision the Board of Mineral Development shall not reduce the State's share of the oil and/or gas to be received in the future under such lease and/or contract to less than one-fourth of the gross production of oil and/or gas from the land described in such lease and/or contract."

The act requires that any supplemental or modificatory contract executed under it shall contain power and authority on the part of the Board to reinstate any money requirement or reduced royalty at any time when in the opinion of the Board shall reinstatement should be made in view of the then existing conditions and fairness to the State under the original lease and contract, and that the Board shall exercise this power whenever in its opinion the interest of the State requires that it be exercised.

The act further provides: That in no event shall the State's portion be less than 1/4 nor more than now provided in said contracts; that no revision shall release the lessees or their assigns from the payment to the State for any oil or gas produced prior to the effective execution of any revision hereunder; that nothing in such revision shall in any wise relieve any lessee or contracting party from any obligation now existing to drill any well; and that no change shall be made by the Board that will relieve, release or suspend the lessee from the payment of any money or royalty now due and payable for oil or gas produced to the date that the Board makes change in the present existing lease contracts.

The emergency clause recites, among other things, the fact that the lessees and their assigns under the leases already executed are asserting that it is not required that the activities of the State and of themselves under such leases shall conform to the valid laws, orders, rules and regulations applicable to development by others than the State, of petroleum or gas bearing land.

The supplemental contract executed July 1, 1933, after reciting the execution of the leases, their ownership by relators, insofar as they affect the area hereinbefore described, the

enactment of Chapter 120, the formal proposal by relators for a revision of the leases, and that the Board after considering all the circumstances "deems a revision of such contracts on the terms hereinafter specified to be fair and advantageous to the State and necessary to accomplish the intent and purposes of the Legislature," etc., states the particulars in which the leases are revised and the terms of the supplemental contract to be as follows:

1. The paragraphs of the leases dealing with royalty and payment out of oil are rewritten so that the oil royalty is changed from 3/8 to 1/4, and the fractional part of the oil from which the additional payments are to be made is changed from 1/16 to 1/64.

2. The following additional obligations are imposed upon the lessees:

a. Lessees agree that their activities shall be subject to the conservation laws and valid orders, rules and regulations applicable to the development by others than the State or its agencies of petroleum or gas bearing land.

b. Lessees agree that when any well heretofore or hereafter drilled ceases to produce oil by natural flow they will provide and equip such well with the necessary machinery and equipment to cause it to continue the production of oil.

c. Lessees agree that they will not exercise their rights of surrender as to any portion of the land upon which there is located at the time of the surrender any well producing oil or gas unless lessees' share of the production from such well is insufficient to pay the cost of operation of the well.

d. Lessees agree to commence the drilling of five additional wells within ninety days from the date of the supplemental contract, and agree that any surrender or relinquishment by them shall not operate to release them from the obligation to drill such additional wells.

3. The supplemental contract is expressly made subject to Chapter 120, and particularly to those portions of the same which permit the Board at any time to reinstate any money requirement or reduced royalty requirement, and which provids that no revision shall relieve or release lessees from any existing obligation to drill a well or from the payment of money or royalty for oil or gas already produced.

The important question of construction presented is whether Chapter 120 authorizes the Board so to revise existing leases as to impose upon the lessees any other obligations than the one specified in the act, namely, to develop and operate the property in accordance with the conservation laws, orders, rules

and regulations; or differently stated, whether the Board is authorized by the act to revise or modify existing leases in any other manner or to any other extent than to reduce the oil royalty to be paid the State and to bind the lessees in consideration thereof to conform to the conservation laws, orders, etc.

Respondent's construction of the act is that it permits the Board to revise existing leases and contracts in such way as necessarily to decrease the consideration moving to the State (the royalty) and that the only consideration for such reduction which the act permits the Board to obtain from the lessees is the agreement to abide the valid conservation laws, orders, etc. While respondent states that he seriously questions the authority of the Legislature to authorize the amendment of an existing contract even for a consideration, his contention that the act is unconstitutional is based primarily upon his construction of the act as above stated, followed by the argument that the agreement of the lessees to abide the conservation laws, orders, etc., affords no consideration for the modification of existing leases because it is but an agreement to do what the lessees are already bound by law to do.

■ Here is applicable the rule that "If a statute is capable of two constructions, one of which will sustain its validity and the other render it unconstitutional, it is our duty to give it that interpretation which sustains the validity of the act." Jones v. Williams, 121 Texas, 94, 109, 45 S. W. (2d) 130. See also: Greene v. Robison, 117 Texas, 516, 8 S. W. (2d) 655; Maud v. Terrell, 109 Texas, 97, 200 S. W., 375.

We conclude, however, from a careful consideration of Chapter 120, and even without resort to the rule last stated, that the act does not undertake to designate the agreement of the lessee or contracting party to develop the property according to the conservation laws and rules as the sole consideration moving to the State in a supplemental contract, and that it empowers the Board to revise existing leases and contracts, subject to certain specified limitations or exceptions, upon such terms and conditions, and for such consideration as the Board may deem advantageous to the State. While it is true that the act as a whole discloses a primary purpose to secure the incorporation of agreements to abide the conservation laws and rules in all leases and contracts for the development of river beds for oil and gas, we find nothing in the act, either express or implied, indicating an intention that only such agreements on the part of lessees may be obtained in making a revision of existing leases and contracts.

The act in Subsection 6b authorizes the Board to revise existing leases and contracts "in such wise as to subject such lease and/or contract thenceforth to the public policy declared in Subsection 6a," but it does not state or indicate that only in such wise may the lease or contract be revised. On the contrary, the very next sentence provides that such revision shall be accomplished by a supplemental or modificatory instrument "on such terms as the Board of Mineral Development may deem fair and advantageous to the State." This language, subject only to the exceptions or provisos thereafter set out in the act, leaves it to the Board to determine, in accordance with its judgment as to what is fair and advantageous to the State, the terms, conditions, covenants and stipulations which shall be contained in the instrument constituting the agreement of modification.

■ The word "terms" is sometimes interpreted, on account of the particular method of its use, to have reference to the amount and the manner of making payment of purchase money, but generally when used with respect to the contents of contracts it is construed as embracing the conditions, covenants, limitations and propositions comprising the things which the parties to the contract have agreed to do or not to do. LeRoy v. Beard, 8 How. (U. S.) 451, 12 L. Ed., 1151; Hurd v. Whitset, 4 Colo., 77; Little v. Banks, 85 N. Y., 258; Yazoo & M. V. R. Co. v. Scott, 108 Miss., 871, 67 So., 451, L. R. A., 1915E, 239; Roberts-Atkinson Co. v. International Harvester Company, 191 N. C., 291, 131 S. E., 757; People v. J. O. Beekman & Co., 347 Ill., 92, 179 N. E., 435; Words and Phrases: First Series, Vol. 8, pp. 6922-6923; Second Series, Vol. 4, pp. 884-885; Third Series, Vol. 7, pp. 440-441; Fourth Series, Vol. 3, p. 644.

■ The argument is made that the words, "such terms as the Board of Mineral Development may deem fair and advantageous to the State," used in Subsection 6b, refer only to the discretion vested in the Board to adjust the royalty up or down, and that the only discretion vested in the Board is in determining the amount which the State's royalty will be reduced within the prescribed limits. The language used in the act is not susceptible of such interpretation, for it broadly invests the Board with authority to enter into supplemental contracts on such terms as it may deem fair and advantageous to the State, in no way limiting or even directing the discretion thus given to the matter of reducing or revising the royalty. The act does not confine the Board's discretion in the making of the revision to the determination of the extent to which the

royalty may be reduced, for the additional reason that it is not required that the royalty be reduced. It is true that the royalty may not be increased above the amount fixed in the original contract or lease, but under the terms of the act a contract may be revised without changing the royalty, it being provided merely that the Board shall not reduce the royalty to less than one-fourth, and that the instrument shall reserve a right in the Board to reinstate any money or royalty requirement that may be reduced. The only thing expressly required to be contained in the contract of revision is the agreement of the lessee to abide the conservation laws, orders, etc.

It is to be remembered that the law which created the Board left to its discretion the terms and conditions upon which contracts or leases might be made by it for the development of river beds, stipulating only that leases should reserve at least one-eighth interest or royalty, and that contracts and leases should contain safeguards against pollution of the streams. It is not to be assumed, in the absence of language expressing such purpose, that the Legislature, after having entrusted the original making of the contracts and leases to the discretion of the Board, intended, when by later act it authorized the Board to revise such leases and contracts by the making of supplemental contracts, to leave the Board practically no discretion in fixing the terms and conditions of such supplemental contracts. The Legislature must have understood that the Board would be in a better position to determine at the time the revision might be made just what terms and conditions would be advantageous to the State than it would be to undertake in advance to fix advantageous terms and conditions, and knowing this, it left the terms of the supplemental contracts generally to the Board's discretion, imposing only certain limitations which it deemed important for the protection of the State's interest.

The very placing of these limitations in the act by way of provisos evidences the legislative understanding that the act conferred broad discretionary powers upon the Board in the making of revisions.

It is our opinion, therefore, that the Board did not exceed its authority in obtaining in the revision the additional obligations on the part of the lessees.

■ Chapter 120 is challenged as in violation of Sections 44, 51, 53 and 55 of Article III of the Constitution. These sections prohibit the Legislature from: granting extra compensation after a public service has been performed or contract entered

into for the performance of the same; granting money out of the treasury on any claim when same shall not have been provided for by preexisting law; granting or authorizing any grant of public money; granting or authorizing the granting of any extra compensation to any officer or contractor after service has been rendered, or a contract entered into and performed in whole or in part; releasing or extinguishing, or authorizing the releasing or extinguishing, in whole or in part, of any indebtedness, liability or obligation to the State or to any county or municipal corporation.

The question presented is whether these sections of the Constitution, or any of them, prohibit the Legislature from authorizing the diminishing or reducing, for a consideration, of an executory obligation to the State in an existing contract. Or the question may be said to be whether the Legislature has the authority, in view of these sections of the Constitution, to authorize the amendment or modification of an existing contract with the State, for a consideration.

The decisions having to do with these sections of the Constitution do not literally or rigidly construe or apply them. They treat them as prohibiting the gratuitous disposition of the State's money, property, or contractual rights.

In Byrd v. City of Dallas, 118 Texas, 28, 6 S. W. (2d) 738, one of the questions certified was whether a statute authorizing a city to appropriate money for the payment of pensions to retired policemen and firemen was invalid because of limitations on legislative power contained in Sections 44, 51, 52 and 53 of Article III of the Constitution. The court held the statute to be valid, treating the pension as a part of the compensation paid the policeman and fireman, and in so holding said:

"Without discussing in detail these provisions of the Constitution, it is sufficient to say each of them is intended to prevent the application of public funds to private purposes; in other words, to prevent the gratuitous grant of such funds to any individual, corporation, or purpose whatsoever. * * * If the pension provided for in this act is a gratuity or donation to the beneficiary, it is clearly forbidden by the fundamental law. On the other hand, if it is a part of the compensation of such employee for services rendered to the city, or if it be for a public purpose, then clearly it is a valid exercise of the legislative power."

Dallas County v. Lively, 106 Texas, 364, 167 S. W., 219, holds that an order of the Commissioners Court allowing the county judge compensation for ex officio services already performed is not forbidden by Section 53 of Article III. The

words "extra compensation" are construed as meaning any sum given in addition to the contract price or salary, and the compensation for ex officio services is held to be not extra compensation forbidden by the Constitution, because it is for services for which there was no previous allowance.

There was involved in Jones v. Williams, 121 Texas, 94, 45 S. W. (2d) 130, an act of the 42nd Legislature remitting penalties and interest on delinquent taxes if the taxes were paid before a named date. The constitutionality of the act was sustained in an elaborate opinion by Chief Justice Cureton, discussing, among other things, the history and purposes of Sections 51 and 55 of Article III of the Constitution. It was held that the charge of interest upon delinquent taxes is a penalty, that a penalty is not a part of the tax proper, and that the provisions of Sections 51 and 55 do not apply to penalties.

In City of Aransas Pass v. Keeling, 112 Texas, 339, 247 S. W., 818, the Attorney General contested as forbidden by Section 51 of Article III the validity of a grant of state taxes to the City of Aransas Pass for a period for the purpose of building sea walls. The act was held to be valid as being an instance of the use of a city as an agent of the State in discharge of the State's duty. Justice Greenwood said in the opinion: "The act makes no grant of public money as forbidden by Section 51 of Article III of the Constitution. The State here bestows no gratuity."

The case of Bexar County v. Linden, 110 Texas, 339, 220 S. W., 761, held constitutional an act of the Legislature requiring district attorneys to pay into the county treasury excess fees of their offices. The Court of Civil Appeals had held the act invalid as amounting to a grant of public money to counties within the inhibition of Section 51 of Article III. Chief Justice Phillips in the opinion, after stating the substance of Sections 50, 51, 52, 53 and 55 of Article III, as exemplifying the vigilance of the Constitution for the protection of the public funds, said:

"The giving away of public money, its application to other than strictly governmental purposes, is what the provision is intended to guard against. The prohibition is a positive and absolute one except as to a distinctive class to whom the State is under a sacred obligation. * * *

"If, therefore, the effect of the statute is to bestow funds of the State upon counties of the State as a gratuity, or for uses not related to the State's governmental duties, it would be invalid. On the other hand, if its effect is to but apply such

funds to the uses of the State as a government, there can be no reason for holding it void."

In State v. Bradford, 121 Texas, 515, 546, 50 S. W. (2d) 1065, the court sustained as a validating act an act of the Legislature known as the "Small Bill," holding, among other things, that it was not forbidden by Section 51 of Article III because it "did not undertake to give the patentees and awardees and their assigns anything belonging to the State."

In Henson v. Commissioners Court of Henderson County, 56 S. W. (2d) 240, in which application for writ of error was refused, an act of the Legislature validating void road districts and void road bonds was held not to be forbidden by Section 53 of Article III. See, also, Tom Green County v. Moody, 116 Texas, 299, 289 S. W., 381; Louisiana Ry. & Nav. Co. v. State, 298 S. W., 462, 7 S. W. (2d) 71.

A law for payment of bounties for destruction of wolves to protect stock raisers was held not unconstitutional under Sections 51 and 55 of Article III, the court saying:

"The act does not contemplate the granting of public money to any individual in the sense of these constitutional provisions. * * * The individual is in no sense the subject of state bounty condemned by these provisions." Weaver v. Scurry County, 28 S. W., 836.

Since none of the sections of the Constitution which have been cited forbids, either in terms or by necessary or reasonable implication, the changing or modifying of contracts with the State so as to reduce for a consideration executory obligations to the State, and since the decisions which have been discussed construe these sections of the Constitution as forbidding gifts, gratuities, or bounties, or the gratuitous releasing or extinguishing of obligations, our opinion is that Chapter 120, in its necessary effect and operation as determined from its terms, is not unconstitutional. Judkins v. Robison, 109 Texas, 6, 160 S. W., 955. It authorizes the Board to revise existing contracts, but it contemplates and provides that the revision be accomplished by supplemental contract, meaning, of course, a valid contract supported by a consideration.

The act would be within the constitutional prohibition if it undertook to authorize the gratuitous releasing in whole or in part of an existing indtebedness, liability or obligation to the State. Delta County v. Blackburn, 100 Texas, 51, 93 S. W., 420; Judkins v. Robison, 109 Texas, 61, 160 S. W., 955; Greene v. Robison, 117 Texas, 516, 8 S. W. (2d) 655; Empire Gas & Fuel Company v. State, 121 Texas, 138, 47 S. W. (2d) 265.

■ A decision that the Legislature is powerless to authorize the change of an executory obligation in such way as to benefit one who has contracted with the State would deny to the State the important power and right to modify its contracts. In Groce v. P. B. Yates Machine Co. (Com. App.), 288 S. W., 161, it is said that:

"The power to modify or rescind a preexisting agreement is coextensive with the power to initiate it; that is an incident of contractual capacity."

The case holds that parties may by oral agreement modify the terms of an executory written contract although it expressly provides that they may not modify it except by a written instrument executed in a certain manner, and that in the event of modification of an executory contract mutual promises expressed or implied furnish whatever consideration is needed.

American National Ins. Co. v. Teague (Com. App.), 237 S. W., 249, sustains the right of parties to make an enforceable contract of modification when it is supported by a consideration.

In Elliott on Contracts, sections 1987 and 1989, the following rules are thus in substance stated: that parties who have the power to make a contract have the power to unmake or modify it regardless of self-imposed limitations; that by subsequent agreement based upon a sufficient consideration parties may modify their contract in any manner they choose; and that generally a new consideration is required in order for an attempted modification of a contract to be valid.

Justice Pierson, in Chas. Scribner & Sons v. Marrs, 114 Texas, 11, 21, 262 S. W., 722, thus spoke of the right and power of the State to contract:

"The State in its sovereignty has the right and power to contract. Unless limited by organic law, the subjects of contract, the length of term for which a contract may be made, and the general public policy regarding contracts, are within the legislative prerogative. * * *

"The power to contract is an important subject. While making limitations on other subjects of equal importance, the Constitution made none on the power to contract, except as to the creation of 'debt.' It would seem if other limitation on the power to contract was intended, it would have been expressed."

The State cannot enjoy and exercise fully the important right to contract unless it is permitted through officers or representatives authorized by the Legislature to modify its executory contracts when a proper occasion arises.

A striking illustration of the importance to the State of the right or power to modify its contracts is found in the contract

and supplemental contracts for the construction of the State Capitol. The biennial reports of the Capitol Building Commission contain a number of supplemental contracts by which from time to time as the work progressed changes were made in the plans and specifications constituting part of the original contract. The most important of these was the supplemental contract by which the contractor agreed to use as the material for the exterior construction red Texas granite instead of limestone as specified in the original contract. To secure the contractor's consent to such change a number of important concessions were made whereby the contractor was relieved of obligations imposed by the original contract, some of which concessions were: The elimination of two porticos from the east and west ends of the building; the substitution of wooden panel wainscoting for marble wainscoting; the elimination of an elevator; the substitution of marble tiling for encaustic tiling; important changes favorable to the contractor in the design and finish of the wood work. See Third Biennial Report of Capitol Building Commission pp. 34-40, 195-198.

Had the State been without the power to change or modify obligations imposed upon the contractor by the original contract, the change to red Texas granite apparently could not have been made, for as the report shows, there was no appropriation by which the contractor could have been compensated. The validity of the supplemental contract by which these changes were accomplished appears never to have been questioned. That contract was involved incidentally at least in two suits which reached the Supreme Court, and in them it was discussed by the Court and apparently assumed to be valid. Taylor v. Robison, 72 Texas, 364, 10 S. W., 245; Findlay v. State, 113 Texas, 30, 48, 250 S. W., 651.

The important power to modify its contracts should not be denied the State, in the absence of a clear expression in the Constitution of an intention to forbid the Legislature to authorize their modification.

■ Do the obligations imposed upon the lessees in the supplemental contract constitute adequate consideration for the reduction of the royalty and the reduction of the fraction out of which the oil payment is to be made? Respondent's position is that they are but agreements by the lessees to do what they are already bound to do under the law and under the leases, and therefore are no consideration.

The first is the agreement by lessees that their activities in developing and operating the property shall be subject to the

conservation laws, orders rules and regulations. It is forcefully argued by relators, in a companion case this day decided (Blue Star Oil Co. v. Allred, Attorney General, post, p. 250) that these laws, regulations, etc., are not applicable to lessees operating upon state land and to whom the leases do not convey title to the oil and gas in place. We are of the opinion that relators have at all times been subject to the conservation laws, rules and regulations. But even so, it was beneficial to the State that the contracts contain an express agreement on the part of the lessees so to develop and operate the property. Thus a violation by lessees of the conservation laws, rules or regulations punishable by fine or penalty would be also a breach of contract for which the State would have additional appropriate remedies. Whether the incorporation of this obligation in the supplemental contract constitutes a consideration adequate to support it need not be determined because of our conclusion that other obligations contained in the supplemental contract do afford adequate consideration.

One of these is the agreement of lessees, whenever any well drilled or to be drilled ceases to produce oil by natural flow, to equip the well so as to cause it to continue the production of oil. The leases contain no express agreement on the part of lessees to equip wells for the pump after they have ceased to flow. There existed only the implied obligation to use reasonable diligence. Under it the lessees were bound to equip for the pump a well that might cease to flow only when under the same or similar circumstances an operator of ordinary prudence and diligence would so equip it. The duty to equip wells is but a part of the duty to develop and operate the property and market the production. A lessee's obligations in the performance of the implied covenants as to development, operation, equipping and marketing are measured by the same rule, reasonable diligence, or what an ordinarily prudent and diligent operator would do. He is not required to continue in their performance unless continuance will be profitable, not only to his lessor, but also to him. T. P. Coal & Oil Co. v. Barker, 117 Texas, 418, 6 S. W. (2d) 1031; Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Texas, 439, 6 S. W. (2d) 1039; W. T. Waggoner Estate v. Sigler Oil Co., 118 Texas, 509, 19 S. W. (2d) 27; Grubb v. McAfee, 109 Texas, 527, 212 S. W., 464; Cole Petroleum Co. v. U. S. Gas & Oil Co., 121 Texas, 59, 41 S. W. (2d) 414; State Line Oil & Gas Co. v. Thomas, 35 S. W. (2d) 746; Brewster v. Lanyon Zinc Co. (U. S. C. C. A.), 140 Fed., 801; Texas Company of Mexico v. Roos (U. S. C. C. A.), 43 Fed. (2d) 1; Cosden Oil Co. v. Scarbrough (U. S.

C. C. A.), 55 Fed. (2d) 634; Summers' Oil Gas, pp. 432-435; Merrill's Covenants Implied in Oil & Gas Leases, pp. 151, 153; Texas Law Review, June 1933, p. 439.

It follows that lessees were not bound under the implied obligations of the original leases to equip for the pump any well when the oil ceased to flow unless its equipment and subsequent operation could reasonably be expected under all the circumstances to result in profit to the lessees over and above the cost of the equipping and operation.

The unqualified obligation imposed upon the lessees in the supplemental contract to equip at their own expense all wells that cease to flow, regardless of the probable amount of production on the pump, the probable life of the well, the price of oil, and other facts having bearing upon the question of profit or loss to lessees, is distinctly different from the implied obligation, and is clearly beneficial to the State and burdensome to the lessees.

It appears to be conceded by both parties that under the original leases lessees could avoid the performance of whatever implied obligation might exist to equip for the pump a well that ceased to flow, by surrendering an area inclusive of the well. Whether the performance of the obligation as imposed by the supplemental contract may be avoided in the same manner is unimportant in determining the sufficiency of the obligation as a consideration, because it is a new and different obligation which binds the lessees at least until the option to surrender is exercised. Corsicana Petroleum Co. v. Owens, 110 Texas, 568, 572, 222 S. W., 154.

The agreement of lessees in the supplemental contract not to exercise their rights of surrender as to any portion of the land upon which there is located any well producing oil or gas, unless lessees' share of the production is insufficient to pay the cost of operation of the well, is also a substantial consideration.

█ Paragraph 20 of the original leases gives the lessees the right to surrender or relinqnish the leases at any time as to the entire area or any portion of the area, by the payment of $1.00, and the execution of an instrument of relinquishment. Such surrender clause is valid and its presence does not invalidate the leases. Corsicana Petroleum Co. v. Owens, 110 Texas, 568, 222 S. W., 154; Guffey v. Smith, 237 U. S., 101, 59 L. Ed., 856. The lessees had under the original leases the right to surrender any area whether there was a producing well on it or not and regardless of the capacity of any well that might be on it.

According to this new agreement the lessees may not surrender an area upon which there is situated a producing well, however small the production may be, so long as the well will pay the bare cost of its operation. Under paragraph 17 of the leases the abandonment of the operation of a well which pays the lessees the cost of its operation is prohibited. The leases therefore as modified require the lessees to continue to operate for the benefit and profit of the State wells which make no more oil than enough to pay the cost of their operation. This they cannot escape either by the abandonment of the well or by the surrendering of an area on which it is situated. Prior to the modification lessees could escape this burden by exercising the right to surrender an area including the small well. The prohibition of abandonment contained in paragraph 17 of the leases is not a limitation upon the right of surrender given by paragraph 20. Abandonment of a well, or abandonment of the operation of a well, is one thing, surrender of an area upon which a well is situated is another.

Having concluded that two of the new agreements on the part of the lessees are substantial and adequate considerations supporting the supplemental contract, we need not discuss the agreement to commence the drilling of five additional wells within ninety days from the date of the supplemental contract, further than to say that it does appear from the facts set out in respondent's answer and supplemental answer that relators in the performance of the obligations imposed by the original leases were required to commence that number of wells, and probably more, within the ninety days, and to add that the agreement to commence five additional wells within ninety days is not to be construed as relieving lessees of any of the drilling obligations placed upon them by the terms of the original leases.

The question whether the supplemental contract is in fact advantageous to the State, or whether the State will eventually gain or lose by reason of its execution, is not presented. Chapter 120 placed upon the Board the duty to determine before executing the supplemental contract that it would be fair and advantageous to the State; and the contract contains the recital over the signatures of the members of the Board that, after reviewing all the circumstances, including those stated in the formal proposal for revision, the Board deems a revision of the contract on the terms set out to be fair and advantageous to the State. There is no contention and no suggestion

in any fact, that the Board acted fraudulently or arbitrarily, or that it abused its discretion.

As indicating, however, that there was no abuse of discretion by the Board, brief mention may be made of facts which doubtless were considered by it in making its finding. The Board was of course fully aware of the terms of the original leases, including the right given the lessees to surrender any part of the area at any time. It must have known and considered the facts shown by the record as to the intensive development of the land immediately adjoining the river bed area and the fact commonly known that hundreds of wells had been drilled and were being drilled in the East Texas oil field. In this situation it was of great importance to the State that the river bed area be developed as rapidly and thoroughly as possible. The continued reduction of the per well allowable in the East Texas field, the low price of oil, the added expense incident to the development of river beds, all matters of common knowledge, coupled with the unusually large royalties required to be paid, the additional payments to be made from the production from each well, and the great number of wells required to be drilled, were reasonably calculated, as the Board must have known, to induce the lessees for financial reasons to surrender portions of the river bed. Such surrender would have delayed the development until new contracts could be made, with the possibility, or probability, that new contracts could not be made which would be as advantageous to the State as the existing leases, even after their modification. The Board must also have weighed the additional obligations imposed by the revision upon the lessees, which have been discussed, and determined that they were advantageous to the State.

Since the execution of the contract of revision relators have completed 37 producing oil wells upon the river bed area involved herein, all of which have been offsets to producing wells on adjoining lands, thus saving through prompt drilling quantities of oil which would have been lost to the river bed area by drainage. From the production of these additional wells the State is to be paid, in addition to royalty, $5,125 per well.

An advantage which may accrue to the State under the terms of the supplemental contract rests in the reservation by the Board of the right at any time, when it deems it fair under the existing conditions, to reinstate any reduced royalty or money requirement. This reservation places it within the power of the State to make the leases more beneficial to the State than they originally were, since, in the event of such reinstatement the lessees would still be bound by the additional

obligations imposed upon them in the supplemental contract.

It would be impossible to determine now the ultimate result to the State financially of the contract of modification, but in the light of the facts reflected by the record and those of which judicial notice may be taken, it cannot be said either that the Board's finding that the contract is fair and advantageous to the State is arbitrary or that it is not supported by facts.

■ The supplemental contract by its terms was made effective from and after July 1, 1933, following the Board's determination that under the facts and circumstances then existing a revision of the leases on the term stated in the new contract, which include its effective date, was fair and advantageous to the State. The refusal of respondent to approve the contract on account of his sincere but mistaken belief that the act of the Legislature authorizing its execution was unconstitutional and that some of the terms of the contract were not authorized by the act, should not serve to postpone the effective date of the contract, since its determination is left, as other terms of the contract, to the discretion of the Board.

The writ of mandamus will issue in accordance with the prayer of relators' petition, and directing the approval of the contract as of July 1, 1933.

Adopted by the Supreme Court, April 18, 1934.