**TIDE WATER ASSOCIATED OIL CO. et al. v. STOTT et al.**

No. 11669.

Circuit Court of Appeals, Fifth Circuit.

Dec. 30, 1946.

Writ of Certiorari Denied May 5, 1947.

See 67 S.Ct. 1306.

Dwight L. Simmons, of Dallas, Tex., Rex G. Baker, of Houston, Tex., and Tom P. Caldwell, of Hattiesburg, Miss., amicus curiae for appellants.

Philip L. Kelton, of Dallas, Tex., for appellees.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

LEE, Circuit Judge.

This is a suit by oil and gas lessors for damages to their leases alleged to have resulted from lessees' recycling operations on neighboring lands.

The appellees, Elizabeth Jansing, Virginia Young Stott, and Mae Young Lubben, plaintiffs below, executed separate oil and gas leases in 1935 and 1937, covering their respective tracts of 25, 109.35, and 72.04 acres in the John Adams Survey, Anderson County, Texas. The appellants, Tide Water Associated Oil Company and Seaboard Oil Company of Delaware, defendants below, now own these leases except for an assignment to Haynes B. Ownby Drilling Company of 48.49 acres of the original 72.04 acres of the Lubben lease and of 69.36 acres of the original 109.35 acres of the Stott lease. Appellants, in the assignments to Ownby, reserved an overriding royalty and extensive controls over operations upon, and marketing of the products from, the assigned leases.

Including 88 acres of the appellees' land on which appellants still hold leases directly, appellants, during the period involved,

held oil and gas leases covering 2215 acres underlaid with wet gas in a common reservoir of approximately 7355 acres. Except for the leases assigned to Ownby and those affecting two very small tracts, appellants owned leases entirely surrounding the lands of appellees on the north, east, and south.

Early in 1939 two other operators in the common pool commenced recycling operations, and in December of the same year appellants adopted the practice. In order profitably to conduct recycling operations it is necessary to unitize or pool tracts of substantial size, and beginning in mid-1939 appellants approached appellees with various proposals for unitization of their tracts with other lands and to have appellees participate in the recycling operations on the same basis as the royalty owners under other tracts subject to appellants' leases. Although both sides carried on negotiations in good faith, appellees declined to unitize and participate on this basis.

Appellants drilled a well on each of the three tracts and have produced from such tracts all of the oil that could be produced and all of the gas for which there was a market. The royalties due on these products and on the distillate or condensate separated from the gas at the well have been paid to the appellees.

Since recycling is not practicable on any of these tracts alone, appellants operated the wells on the three tracts, extracting condensate in separators at the well and selling the remaining semi-dry gas to the Lone Star Gas Company, the only market for gas in the field. Under regulations for prevention of waste, the gas could not be flared, and consequently production of condensate from the wells on the tracts was limited by the market available for the residue gas.[1]

Under the recycling operations conducted on all other leases held by appellants (and substantially all other leases in the field) the "wet" gas is produced from withdrawal wells, processed though a gasoline plant which removes a higher proportion of liquid hydrocarbon than is possible by the use of simple separating devices at or near the well, and the remaining "dry" gas is returned under pressure through injection wells to the common reservoir. Since residue gas is not wasted but is returned to the reservoir for future use, a much higher production of gas is permitted for extraction of liquid hydrocarbons under this method of operation. The higher pressure of the dry gas at the injection wells forces the dry gas towards the points of lower pressure at the withdrawal wells, and gradually the dry gas spreads and the wet gas is withdrawn until the field becomes a dry-gas field, no longer useful for production of liquid petroleum products. In this process the dry-gas areas gradually extend from the injection wells.

Plaintiffs-appellees sued to recover damages from lessees to the extent of the royalty fraction of condensate which might have been removed from the wet gas under their lands which has now been replaced by dry gas as a result of the recycling operations conducted upon other leases in the field. The court below found that under appellees' three tracts the wet gas had been replaced by dry to the extent of 3.0 acres under the Jansing tract, 21.9 under the Lubben, and 9.0 under the Stott, with additional dry acreage under those portions of the Lubben and Stott tracts affected by the Ownby assignments. Upon these findings, after trial without jury, the court concluded that appellees had been damaged to the extent that the wet gas under their lands had been replaced by dry gas and gave judgment for the plaintiffs upon this basis.

As stated by Summers in his treatise on oil and gas, the implied covenants of an oil and gas lease are:

"1. A covenant to drill wells within a reasonable time, testing the land for oil and gas.

"2. A covenant to drill test wells within a reasonable time after notice, even though the lease provides for delay by the payment of delay rentals.

"3. A covenant, if oil or gas be found in paying quantities, to proceed with reasonable diligence in drilling sufficient number of wells to reasonably develop the premises.

[1] Article 6008, §§ 3 and 7, Texas Civil Statutes.

"4. A covenant to protect the land from drainage through wells on adjoining lands by drilling offset wells.

"5. A covenant to market the product of producing wells." [2]

■ Reasonable development and marketing of the products are conceded. The implied covenant to protect from drainage does not impose an insurer's liability upon the lessee: "It is well-settled law in Texas, that, to establish a cause of action [for damages resulting from alleged failure of the lessee to prevent drainage] it must affirmatively appear both from the pleadings and evidence (1) that [the lessee] could have drilled a well or wells on the land in controversy, producing gas at a profit to itself. * * * (2) That [the lessee], in the exercise of ordinary care should have drilled a well or wells on said land at the time alleged with reasonable expectation of receiving a reasonable profit from the gas produced after deducting the expense incident to the drilling, development, and marketing of the products." [3]

■ It is conceded that a reasonable and prudent operator would not have drilled an additional well upon any of the appellees' three tracts; that the lessees were producing from these tracts all of the mineral products which could be produced in the absence of recycling; and that recycling was not practicable in the absence of unitization, which the lessors had refused. The appellants, therefore, have fulfilled their implied covenant to protect the premises from drainage.

The appellees contended, however, that there is an additional implied covenant of an oil and gas lease obligating the lessee not to injure his lessor's lease. They contend, in effect, that, even though the lessees are not liable under the implied covenant to protect from drainage, they are liable because the drainage has been effected through operations by the lessees themselves on other premises.

We do not find any mention of an "implied covenant not to injure the lessor's lease" in any of the standard treatises cited supra; the only authority which we can find for such an implied covenant is Humphreys Oil Co. v. Tatum 5 Cir., 26 F.2d 882, certiorari denied 278 U.S. 633, 49 S.Ct. 31, 73 L. Ed. 550. In the Tatum case the lessee had drilled only two wells of the four which the court found necessary for complete development of the leased premises and for protection from drainage, and the same lessee was draining oil from its lessor's tract by wells on adjoining tracts subject to leases also held by the lessee. After holding that the lessee was liable to the lessor for violation of its implied covenant to develop the property and to protect it from drainage, the court continued, to say, 26 F. 2d at page 884: " * * * The case here presented is much stronger in favor of appellees than if the draining wells had been drilled by third persons. There would certainly be an implied covenant that the lessee would do nothing to impair the value of the lease of the lessor. If appellants saw fit to drill on their own adjoining land, it was their duty to use reasonable care in good faith to protect appellees from damage caused thereby."

■ The court having found that the lessee was liable for failure to drill additional wells on the leased tract necessary for reasonable development and protection from drainage, the quoted passage was not necessary to the decision in that case. If a reasonable and prudent operator would not have drilled an additional well on the leased tract, the lessors could not have recovered from the lessees damages for draining the leased tract from adjacent premises. Cooper v. Ohio Oil Co., 10 Cir., 108 F.2d 535; Hutchins v. Humble Oil & Refining Co., Tex.Civ.App., 161 S.W.2d 571, error refused by Sup.Ct.Tex.

■ The situation in the Hutchins case was even more favorable to the lessor than that presented here. The lessee in that case

[2] 2 Summers, Oil and Gas, 309, § 395. See also Mills-Willingham, Law of Oil and Gas, 151, 152, § 105; 1 Thornton, The Law of Oil and Gas (3rd Ed.) 155–158, § 98.

[3] State Line Oil & Gas Co. v. Thomas, Tex.Civ.App., 35 S.W.2d 746, 747, error dismissed by Sup.Ct.Tex.; Texas-Pacific Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.2d 1031, 60 A.L.R. 936; Rhoads Drilling Co. v. Allred, 123 Tex. 229, 70 S.W.2d 576.

held two separate leases from the lessor on approximately 28 acres upon which there was one producing well; the lessee was draining the leased premises from two wells located upon tracts of slightly over 15 acres each, which were owned by lessee in fee simple. After the jury had found that a reasonable and prudent operator would not have drilled another well on the lessor's 28 acres, judgment was given for the defendant and affirmed on appeal. The duty of an oil and gas lessee to operate the leased premises in a reasonable and prudent manner cannot prevent his operating the adjoining properties to the mutual advantage of the lessee and lessor there concerned.

As explained by the court in Humphreys Oil Co. v. Tatum, supra, the implied covenant of the lessee to do nothing to impair the value of the lease to the lessor is a duty "to use reasonable care in good faith to protect appellees from damage caused" by drilling on the lessee's adjoining land. See Boggess v. Milam, W.Va. 34 S.E.2d 267, 269. In the present case appellants, as lessees, repeatedly offered to the lessors plans for unitization of their three tracts in order that the appellees might participate in the recycling operations. Appellees contend, however, that no plan submitted for unitization and recycling was fair: The principal bases of contention are (1) that the contracts submitted computed royalties upon a different basis from those used by other operators in the field, and that the difference was prejudicial to their interests; (2) that the royalties offered were only $\frac{1}{2}$ of $\frac{1}{8}$ of the amount (less taxes) received by the recycling plant for the liquid hydrocarbons recovered in the plant; (3) that the appellants refused to make such royalties retroactive to commencement of the first recycling operations; and (4) that appellants refused to except condensate trapped in separators at the well from the effect of the unitization agreement.

The trial court found that the plan offered to the appellees was to have them participate in recycling operations "in the same manner and on the same basis as other landowners and royalty owners in the field."

The record supports the trial court in this finding of fact, and there is no evidence to show that the prevailing plan was unfair to the royalty owners in general or to the appellees in particular.

When the lessee used gas for the manufacture of gasoline or other such products, the royalty provided for the lessor in the Lubben and Stott leases was $\frac{1}{8}$ of the market value of the gas, and that in the Jansing lease was $\frac{1}{8}$ of the net proceeds from the sale of the products after deducting the cost of manufacture. The trial court found that the prevailing royalty paid to royalty owners for wet gas in the Long Lake Field during the time involved in this suit was $\frac{1}{2}$ of $\frac{1}{8}$ of the amount (less taxes) received by the recycling plant for the products recovered in the plants from the wet gas. There is no evidence to show that this royalty was unfair; on the contrary, as expressed in Armstrong et al. v. Skelly Oil Co. et al., 5 Cir., 55 F.2d 1066, 1068:

"* * * Appellees were under no obligation to erect a plant to treat this gas. When they did so they were entitled to deal with the lessor the same as a stranger would have done. Had the gas been sold to an extraction plant, the lessee, under the universal custom of the trade, would have received returns identically the same as those made by appellees.

"The method used to ascertain the value of the gas taken is fair. It would not be just to settle with the seller of the gas at the market price for the full amount delivered. That would leave nothing to cover shrinkage in extraction and the cost of manufacture, including overhead charges, and a fair return on the investment." [4]

The refusal of the appellants to make royalties upon production from the recycling plant retroactive to the date of commencement of the first recycling operations was a refusal on their part to pay dual royalties to the appellees for the period prior to the actual effective date of the appellees' unitization and participation. We see nothing unreasonable or unfair in the appellants' refusal to concede upon this point, particularly since the appellants had approached

---

[4] Cf. Danciger Oil & Refineries v. Hammill Drilling Co., 141 Tex. 153, 158, 171 S.W. 2d 321.

the appellees to secure their participation before the recycling plant commenced its operations.

Nor were appellants unfair in insisting that the appellees' condensate (secured by separators near the wells) should not be excepted from the effect of the unitization. The rights of the various royalty owners within a given unit must necessarily be upon the same basis, and the appellants were fully justified in insisting that the appellees participate (if at all) upon the basis common to their other royalty owners within the unit upon their proportionate part. Moreover, as the plaintiffs' very cause of action shows, the effect of recycling operations is to make certain areas "dry" while others remain "wet;" the purpose of unitization is to equalize the rights of those royalty owners nearest the injection wells and those nearest the withdrawal wells, and this reason extends to condensate produced from separators fully as much as to the products produced in the plant. To except the condensate, in fact, would give rise to unfairness as between the royalty owners within the unit.

■ As the plan offered by the appellants to the appellees, for unitization of their tracts and participation in the recycling operations, was reasonable and fair in all respects, the appellants amply fulfilled any duty of fair dealing which may have been imposed upon them by the lessor-lessee relationship. The leases did not authorize unitization, and appellees were entitled to refuse, as they did, to unitize and to participate in the recycling, but the appellants were not thereby precluded from operating, and were well within their rights in proceeding to operate, their other leases to the best interest of the lessees and such lessors.

That appellants by their recycling operations acted for the mutual protection of themselves and of their lessors, including the appellees, is clearly shown by the record. Prior to the commencement of the recycling operations by appellants, two companies, one owning acreage within the producing area, were operating recycling plants. The evidence is uncontradicted that in about six or seven years, or about 1946, the withdrawal of wet gas and the injection of residue dry gas by the two companies would result in the replacement of wet gas with dry gas under a portion of appellants' acreage, including a portion of appellees' tracts of land, and that in about ten years, or about 1949, the recycling operations of the two companies would withdraw all of the wet gas from the entire reservoir and replace it with injected residue dry gas. Appellants and appellees, therefore, were alike threatened with loss of a common property right with respect to which no recovery in damages could be had. In such circumstances mutual cooperation to protect mutual interests was necessary and as binding upon the appellees as upon the appellants.

■ In short, the appellees may not refuse to cooperate with their lessees for their mutual protection in the adoption of the practicable customary method or plan universal in the Long Lake Field offered them by appellants and at the same time assert and demand damages. The contention of the appellees in such situation is both unique and untenable. Any damage which they suffer is damnum absque injuria and in nowise are such damages chargeable to appellants. Cooper v. Ohio Oil Co., supra; Hutchins v. Humble Oil & Refining Co., supra.

"* * * a tenant in common, particularly one holding a minor interest in the oil and gas, is not to be allowed, by withholding his consent to the development of the boundary in which his interest lies, to prevent the development of an adjoining tract under a unitization agreement to which he has been given an equal opportunity to become a party and in which his cotenants have all joined." Bogess v. Milam, W.Va., 34 S.E.2d 267, 269, 270.

Appellees may correct the situation for the future by participating in recycling operations "on the same basis as other royalty owners in the field."

Having reached this conclusion, it is unnecessary to consider the question of appellees' liability upon those portions of the Lubben and Stott leases assigned to Ownby.

The judgment appealed from is reversed, and the cause is remanded for further pro-

ceedings not inconsistent with the views herein expressed.

Reversed and remanded.