**FUBAR, INC., Appellant,**

v.

**Dana L. TURNER, d/b/a DLT Laboratories, Appellee.**

No. 06–96–00061–CV.

Court of Appeals of Texas, Texarkana.

Submitted Feb. 6, 1997.

Decided April 18, 1997.

Rehearing Overruled May 20, 1997.

Rex A. Nichols, Nichols & Nichols, Longview, for appellant.

Dana L. Turner, Scottsville, for appellee.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

GRANT, Justice.

Fubar, Inc. appeals from a judgment rendered in its accounting suit against Dana L. Turner. After a nonjury trial, the district court construed a contract between Fubar and Turner to require a payment to Fubar of one half of the royalty on insecticide sales rather than a percentage of net profits received by Turner. Fubar contends that the court's construction of the contract is not supported by legally or factually sufficient evidence.

Fubar contends that the trial court's determination that it is entitled to only one half of the royalty or license fee, rather than one half of the revenues, is against the great weight and preponderance of the evidence so as to be clearly and manifestly wrong. Fubar contends that the evidence overwhelmingly indisputably established that Fubar was entitled to one half of any revenues, that the trial court failed to construe the agreement in its entirety, and that the term revenues was not ambiguous and therefore its ordinary meaning applies when construing the agreement.

In reviewing a great weight argument, because the burden of proof was on the appellant, he must show that the finding of the jury was so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); Calvert, 'No Evidence' and 'Insufficient Evidence' Points of Error, 38 Tex. L.Rev. 361 (1960). In reviewing these points, we will examine all of the evidence in the record that is relevant to

the fact being challenged. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442 (Tex.1989).

Fubar introduced the original contractual agreement into evidence, and there was no dispute that the parties entered into the agreement and that it had all the required elements of a contract. Turner testified that by the terms of the contract he sold fifty percent of the revenues from the product.

Dana Turner is the inventor of aaNKILL 44, an insecticide. In 1993, Turner signed a written agreement with Jack Price assigning Price a fifty-percent interest of all future revenues derived from the manufacture, distribution, and sale of the insecticide. The pertinent provision of the agreement is as follows:

For the sum of $25,500, $7,500 payable upon execution of this agreement and six (6) monthly payments of $3,000 each, Grantor hereby irrevocably assigns, sells and transfers unto Grantee *a full fifty percent (50%) interest of any and all future revenues derived from the formulation, reformulation, blending, manufacture, distribution, sale, licensing, etc.,* of a product/technology invented by Grantor known as aaNKILL 44, a.k.a. PLUS, DLT Mount Leveler, an insecticide.

(Emphasis added.) Price later assigned his interest in the contract to Fubar.

In early 1994, Turner received regulatory approval for distributing and selling aaNKILL 44. Turner attempted to secure a satisfactory licensing arrangement whereby another party would process and distribute the insecticide and pay him a royalty, but he testified that he was unable to do so. After his efforts failed and some negotiations were conducted with Fubar, Turner began manufacturing, blending, and distributing aaNKILL 44 himself.

According to Fubar's expert, a certified public accountant who examined Turner's books, Turner ultimately received gross revenues of approximately $374,000, with net profits of approximately $107,000 from the sales. Fubar demanded its share of the revenues. When Turner refused to pay the demanded amount, Fubar filed this suit.

■ The key language or interpretation in the contract is "a full fifty percent (50%) interest of any and all future revenues derived from the formulation, reformulation, blending, manufacture, distribution, sale, licensing, etc."

■ The trial court made no finding of ambiguity. The language is set forth in no uncertain terms that Fubar is to get fifty percent of any and all future revenues from the product, regardless of source. Therefore, it does not matter whether the source is called a royalty, a license, or a sales price. It is one half of all revenues received by Turner. Fubar did not seek one half of the gross revenues received by Turner and has waived any claim for such relief by seeking only net revenues in his pleadings.[1]

■ As the contract provides and the findings of fact and conclusions of law so determine, Fubar has no right to ownership in the company, no control or management, not even any ownership in the product itself. Fubar contracted for one half of the revenues and is entitled to nothing more. As long as Turner has managed and contracted to sell the product in good faith and without fraud, Fubar is entitled only to one half of whatever these proceeds are without limitation to the form in which he sells the product or whether he wholesales it or retails it. This is clear from the contract and the nature of the ownership interest.

The trial court, on the first page of its judgment, concluded that the means that had been adopted under the terms of the contract by Turner was to license the product to DLT Laboratories, Inc. (which as mentioned below was actually a licensing to himself) for $1.00 per bulk gallon of the product.

■ The trial court in the judgment referred to DLT Laboratories, which Turner used to manufacture the product, as DLT Laboratories, Inc. As the style of the case shows, Turner was doing business as DLT Laboratories. It was not a separate entity from Turner. There was no evidence or allegation to show it was a corporation, or that it functioned as a corporation. Its money was commingled with Turner's, and Turner expended funds from its revenues for his personal use, according to his own testimony.

Turner had testified in the suit that a $1.00 per gallon was a reasonable fee for the license. The problem with this arrangement, and basing the revenues on this arrangement, is that it is self-dealing. It is Turner contracting with Turner as a method to circumvent the terms of the contract. Therefore, the revenues that Turner receives from manufacturing, whether he does it under the name of Turner or d/b/a DLT Laboratories, is still the income of Turner, who entered into a contract to pay fifty percent of his revenues to Fubar. This does not comply with the terms of the contract, because the real net revenues to Turner, even by his own testimony, far exceeded $1.00 per gallon. Because Fubar has only sought one half of the net revenues, Turner is in a position to write off all his reasonable expenses, including a salary for himself as manager and operator of the company. While it is true that a trial court can sometimes furnish a missing element to a contract, in the present case there is no missing element. The consideration is susceptible to a determination based upon the net revenues made by Turner from the sale of the contract. The trial court cannot now bind Fubar to a set amount under the terms of the contract that provided for half of the actual proceeds, agreed by Fubar to be based upon the net.

In enforcing the original agreement, the trial court was required to determine the dollar amount due Fubar for "a full fifty percent (50%) interest of any and all future revenues."

The construction of an unambiguous written instrument is a question of law for the court. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515 (Tex.1968). When the writing is unambiguous, the intent of the parties is objectively determined from

---

1. In Fubar's first amended petition, the pleading upon which it went to trial, Fubar asked the trial court for the following relief: "A declaration that Plaintiff is entitled to one-half of the past and future *net profits* derived from the sale of aaN-KILL 44, Bioguardian, Protexit and H2O Water Surfactant." (Emphasis added.)

its content.[2] *Id.* If a contract is ambiguous, parol evidence may be brought in to explain the ambiguity, as long as it is not inconsistent with or tries to vary or contradict the terms of the written agreement. *See Hubacek v. Ennis State Bank,* 159 Tex. 166, 317 S.W.2d 30 (1958).

▇▇▇ Extrinsic evidence was admitted from Turner during the trial. Because the terms of the contract are not ambiguous and because any attempt to limit the consideration specified in the contract would be an attempt to contradict the contract, it must be assumed that Turner's testimony was admitted to allow him to attempt to show a modification agreement between him and Price. The modification of an existing contract must be based upon sufficient fresh consideration. *Rhoads Drilling Co. v. Allred,* 123 Tex. 229, 70 S.W.2d 576 (1934). It must have the same degree of mutuality required to create the initial agreement. *Peyton Packing Co. v. Sweetwater Cotton Oil Co.,* 70 S.W.2d 829 (Tex. Civ. App–Eastland 1934, no writ). One party alone cannot modify a contract after it is entered into, but a meeting of the minds of the parties is essential. *Pittman & Harrison Co. v. Knowlan Machine & Supply Co.,* 216 S.W. 678 (Tex.Civ.App.-San Antonio 1919, no writ).

There was nothing in the testimony that suggested that Price, or his assignee, was to get any type of new consideration that he was not to receive under the original contract because Turner had decided to manufacture the product. There was also no evidence to show any mutuality or meeting of the minds between the two parties. Price was never under any agreement requiring him to put any money into the manufacturing process, and if Turner decided to go into the manufacturing process, that was his decision and right under the contract. This did not, however, under the terms of the contract mean that he would get any additional portion of the revenues. He testified that he sent Price a letter, which is entered into evidence, telling him that he planned to go into the manufacturing of the product and that he was going to pay Price a royalty. The letter included the following language:

DLT LABORATORIES will issue a $1.00 royalty for each bulk gallon of the product "aaNKILL 44" shipped to TIMSO (sic) (and/or any other distributor with whom DLT LABORATORIES might later enter into agreement), and the accumulated royalties shall then quarterly be placed in escrow for yearly disbursement to the parties entitled to a share of those royalties (please see 21 July addendum to our letter of agreement/contract). As shipment of "aaNKILL 44" began on October 17, 1994, the first payment to the account will be made on or before January 1, 1994 and disbursement to the entitled parties will occur on October 15, 1995—and yearly upon that date thereafter, unless all parties agree to a substitute date.

When he was asked about this letter, Turner testified as follows:

Q Now, after you sent this letter out to Mr. Price that's marked I believe D–5, the 29 November, '94 letter, did Mr. Price ever object to you going into manufacturing and paying him a royalty?

A No, sir. Even on the times I saw Mr. Price on a couple other occasions, he never mentioned anything that he disagreed with.

A contract cannot be modified by silence. Price's failure to respond to this letter does not prove the necessary elements of consideration, mutuality, and a meeting of the minds. A unilateral declaration in a letter does not alter the binding terms of the original contract. As a matter of law, there was no modification of the original contract.

The trial court's determination that the contract between Fubar and Turner requires only the payment of a license fee to Turner is error as a matter of law. This cause is reversed and remanded for a new trial to determine the amount of the net revenues received by Turner and to award Fubar a

---

**2.** Turner contends that the contract should be construed against Price because he prepared it. This rule only applies if there is an ambiguity to be construed. *See Gonzalez v. Mission American Ins. Co.,* 795 S.W.2d 734, 737 (Tex.1990). Also, in the present case, Turner added words to the contract proposed by Price before it was signed.

judgment based upon one half of that amount.