MISSION RESOURCES, INC., f/k/a Bellwether Exploration Co., Coastal Oil & Gas Corp., and Coastal Oil & Gas USA, L.P., Appellants,

v.

GARZA ENERGY TRUST, et al., Appellees.

No. 13–02–136–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

May 5, 2005.

Timothy E. Gehl, Baker & Botts, Lynne Liberato, Alene Levy, Mark Trachtenberg, Haynes & Boone, Houston, Elizabeth N. Miller, Richard P. Marshall, Jr., Scott Douglass & McConnico, L.L.P., Austin, for appellants.

Ramon Garcia, Law Office of Ramon Garcia, P.C., Edingburg, Michael D. Jones, Kilburn, Jones, Gill & Campbell, L.L.P., Houston, George Leal Willingham, Law Office of George Leal Willingham, Bennett L. Stahl, Loeffler Jonas & Tuggey, L.L.P., San Antonio, for appellees.

Before Justices HINOJOSA, YAÑEZ and GARZA.

## OPINION

Opinion by Justice GARZA.

On motion of the Court, the opinion issued in this matter on April 7, 2005 is withdrawn and the following opinion is issued in its place. In this opinion, the Court revises its legal-sufficiency review of the evidence supporting the jury's finding of malice and felony theft to conform to the supreme court's precedent in *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 609–10 (2004).

This is an appeal from a judgment of approximately $14 million against appellant, Coastal Oil and Gas Corporation ("Coastal"), now known as El Paso Production Oil & Gas Company, following a jury trial in Hidalgo County.[1] Appellees, plaintiffs below, are members of the Garza and Salinas families. They are Coastal's lessors in several undivided mineral leases in Share 13, the subject matter of this suit. Appellees asserted multiple causes of action at trial. They alleged Coastal committed a subsurface trespass on Share 13 through the fracture treatment of a well located on an adjacent tract of land known as Share 12. They also claimed that Coastal breached the duty of good faith pooling, as well as the implied covenants to market, develop the leasehold, and protect against drainage.

Following a trial, the jury returned a verdict in favor of appellees on each of their claims except breach of the implied covenant to market. In connection with its trespass finding, the jury found that Coastal had acted with malice and awarded $10 million in punitive damages. The jury also found that Coastal had committed "felony theft," which rendered inapplicable the statutory cap on punitive damages. Coastal now raises fourteen issues on appeal. We sustain Coastal's thirteenth issue regarding attorneys' fees, reverse the judgment as to that issue, and affirm the judgment in all other respects.

## Background

Hydraulic fracturing is a secondary recovery method used to increase production from oil and gas wells. During a "frac job," a thick liquid is pumped into the well under great pressure to fracture or break up rock formations that trap oil or gas. A mixture, often composed of sand, is then pumped into the fracture to prop the fracture open. The oil and gas drain through the fractures out of the reservoir to the wellbore, allowing for the capture of reserves that would otherwise not be produced.

---

1. Mission Resources, Inc. F/K/A Bellwether Exploration Co. was also a defendant in the suit. It filed a notice of appeal but did not file a brief or appear for oral argument. We dismiss its appeal for want of prosecution. See Tex.R.App. P. 38.8(a).

Appellees' claim for subsurface trespass is based on Coastal's 1996 "fracing" of the Coastal Fee No. 1 well. The Coastal Fee No. 1 is located on Share 12, adjacent to the southwest corner of Share 13 at a location approved by the Railroad Commission. Coastal owns both the surface and mineral estates of Share 12. Appellees own the surface of Share 13 and, through their leases with Coastal, a royalty interest in the Share 13 mineral estate. Coastal is the lessee of the Share 13 mineral estate. Appellees alleged that Coastal's fracing of the Coastal Fee No. 1 well ("the well") created a subsurface fracture or crack two miles underground that crossed the lease line and drained gas and gas condensate from Share 13. The jury awarded appellees $1 million for subsurface trespass, but the trial court reduced the award to $543,776 to conform to the evidence.

## I. Subsurface Trespass by Hydraulic Fracture Stimulation Treatment of a Well

█ In its first issue, Coastal contends that Texas does not recognize a cause of action for subsurface trespass based on the hydraulic fracture stimulation treatment of a well. According to Coastal, no Texas court has ever held that "fracing" can support a cause of action for trespass damages. Coastal notes that two Texas cases have discussed fracture treatments but maintains that both cases did so only indirectly. *See Gregg v. Delhi–Taylor Oil Co.,* 162 Tex. 26, 344 S.W.2d 411 (1961); *Geo Viking, Inc. v. Tex–Lee Operating Co.,* 817 S.W.2d 357 (Tex.App.-Texarkana 1991), *writ denied per curiam,* 839 S.W.2d 797 (Tex.1992). Based on this precedent, or lack thereof, Coastal asks this Court to reject the trespass-by-fracing theory. We reach the opposite conclusion. The Texas Supreme Court has held that fracing can be a subsurface trespass. *See Gregg,* 344 S.W.2d at 416. To the extent our sister court reached the opposite conclusion in *Geo Viking,* it is in conflict with the Texas Supreme Court and we decline to follow it. *See Geo Viking,* 817 S.W.2d at 364.

In *Gregg,* the issue was whether the trial court, rather than the Railroad Commission, had primary jurisdiction to grant injunctive relief to preserve the status quo when the plaintiff's neighbor was about to frac a well close to the property line. *Gregg,* 344 S.W.2d at 412. The plaintiff claimed that the fracture treatment would be a subsurface trespass. *Id.* at 415. The defendant denied any wrongdoing and further argued that the case should be heard first by the Railroad Commission. *Id.* The supreme court ruled against the defendant and held that the trial court had jurisdiction because the Railroad Commission could not make trespass legal. *Id.* In a passage that Coastal describes as dicta, the supreme court noted that the plaintiff's allegations were "sufficient to raise an issue of whether there is a trespass." *Id.* at 416.

We conclude that the supreme court's statement cannot be discounted entirely as dictum, if it is dictum at all. The *Gregg* decision hinged on the supreme court's conclusion that fracing can be a subsurface trespass. According to the court, "[t]o constitute a trespass, 'entry upon another's land need not be in person, but may be made by causing or permitting a thing to cross the boundary of the premises." *Id.* (quoting *Glade v. Dietert,* 156 Tex. 382, 295 S.W.2d 642, 645 (1956)). If the court had concluded that fracing could not be a trespass, it would have simply dismissed the case and allowed the Railroad Commission to resolve the dispute. But the court did not do so. *Id.* It held that the trial court had jurisdiction—and that the Railroad Commission did not—because the case involved a tort (i.e., trespass). According to the opinion, fracing can create a subsur-

face trespass if "the invasion alleged is direct and the action taken is intentional." *Id.*

The Texas Supreme Court did not revisit the trespass-by-fracing issue until three decades later, when the Texarkana court issued its opinion in *Geo Viking*. *Geo–Viking*, 817 S.W.2d at 359. In *Geo Viking*, an oil well driller named Tex–Lee brought a DTPA claim against a fracing company called Geo–Viking for improperly performing a fracture treatment on a well and failing to increase production. *Id.* The jury awarded Tex–Lee damages for oil and gas that would have been produced if the frac treatment had been performed properly. *Id.* at 363–64. On appeal to the Texarkana court, Geo–Viking argued that the damages awarded to Tex–Lee were excessive because, if completed as designed, the frac job would have crossed the lease lines and trespassed on a neighboring tract. *Id.* Geo–Viking maintained that Tex–Lee should not be allowed to recover damages for oil and gas that would have been improperly drained by a trespass into a neighboring lease. *Id.* According to Geo–Viking, the trial court should have instructed the jury not to include in its damage calculations any oil and gas drained from the adjoining tract. *Id.* Citing "the rule of capture," the court of appeals rejected Geo–Viking's argument that fracing could create a subsurface trespass:

> This rule [of capture] permits the owner of a tract to drill as many wells on his land as the Railroad Commission will allow and provides that he is not liable to adjacent land owners whose lands are drained as a result of his operations. The remedy of an injured land owner in such circumstances is generally said to be self-help.

*Id.* at 364.

Initially, the supreme court reversed the Texarkana court, stating that fracing be-

yond lease lines did constitute subsurface trespass, *Geo Viking, Inc. v. Tex–Lee Operating Co.*, No. D–1678, 1992 WL 80263, at *1, 1992 Tex. LEXIS 40, *1 (Tex.1992) (per curiam); however, the court later withdrew its opinion, denied the writ, and stated: "We should not be understood as approving or disapproving the opinion of the court of appeals analyzing the rule of capture or trespass as they apply to hydraulic fracturing." *Geo Viking*, 839 S.W.2d at 798. Thus, in the end, the *Geo Viking* holding went unreviewed by the supreme court.

*Gregg* and *Geo Viking* appear to conflict: *Gregg* held that fracing could be a subsurface trespass, and *Geo Viking* implied that it could not. This Court will not endeavor to reconcile the conflict. Instead, we follow *Gregg* as it is not for this Court to declare it devoid of precedential value, as *Gregg* remains the law. Coastal's first issue is overruled.

## II. Standing to Sue for Subsurface Trespass

In its second issue, Coastal contends that appellees lack standing to sue because, as royalty interest owners, they lack a possessory interest in the mineral estate. *See H.G. Sledge, Inc. v. Prospective Inv. and Trading Co., Ltd.*, 36 S.W.3d 597, 604 (Tex.App.-Austin 2000, pet. denied) ("Royalty and overriding interests have no possessory right or interest in a tract."). According to Coastal, only a party with a possessory interest in a mineral estate has standing to sue for subsurface trespass. Coastal cites *Pentagon Enters. v. Southwestern Bell Tel. Co.*, 540 S.W.2d 477, 478 (Tex.Civ.App.-Houston [14th Dist.] 1976, writ ref'd n.r.e.) and argues that because appellees have royalty interests and not possessory interests, they have no claim

for trespass, though they might have a claim for breach of the implied covenant to protect against drainage.

■ Standing to sue is a threshold inquiry. *M.D. Anderson Cancer Ctr. v. Novak,* 52 S.W.3d 704, 708 (Tex.2001) ("Standing is a prerequisite to subject-matter jurisdiction, and subject-matter jurisdiction is essential to a court's power to decide a case."). In general, a plaintiff has standing to sue if the plaintiff has suffered an injury that was caused by the defendant and is likely to be remedied by the relief requested. *MET–Rx USA, Inc. v. Shipman,* 62 S.W.3d 807, 810 (Tex.App.-Waco 2001, pet. denied); *see also Brown v. Todd,* 53 S.W.3d 297, 305 (Tex.2001) (citing *Tex. Workers' Compensation Comm'n v. Garcia,* 893 S.W.2d 504, 516–17 (Tex. 1995)). If the plaintiff has no standing, the court lacks subject matter jurisdiction over the plaintiff's claim and must dismiss it. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 443–46 (Tex.1993); *see also Douglas v. Delp,* 987 S.W.2d 879, 882 (Tex.1999) ("Without subject matter jurisdiction, courts may not address the merits of a case.").

■ Although Coastal maintains that appellees have no standing to sue, it has cited no case holding that royalty interest owners cannot sue for trespass. The only case cited by Coastal that arguably addresses the issue of standing held that a company could not sue or recover damages for a trespass that occurred before it ac-

quired title to and possession of the property that was the subject of the trespass claim. *See Pentagon Enters.,* 540 S.W.2d at 477–78.[2] Even assuming that *Pentagon Enters.* dealt with the issue of standing, it is distinguishable from the instant case. Here, appellees owned a real property interest against which Coastal trespassed. Unlike the plaintiff in *Pentagon Enters.,* appellees owned their interest at the time of the trespass. *See id.* This case can be further distinguished from *Pentagon Enters.* because *Pentagon Enters.* did not involve royalty interest owners and in no way purported to decide whether a royalty owner can sue for trespass. *See id.*

Appellees have alleged an injury in the form of a subsurface intrusion by Coastal that caused drainage of gas and gas condensate in which appellees have a royalty interest. Appellees' injury is likely to be redressed by the relief requested (i.e., money damages) because appellees' injury is financial in nature. We therefore conclude that appellees have standing to sue. *Accord HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 890 (Tex.1998) ("A royalty owner may sue for its own damages...."). Coastal's second issue is overruled.

## III. Legal Sufficiency of the Evidence

Coastal's third, fourth, and fifth issues challenge the legal sufficiency of the evidence. When reviewing a legal-sufficiency point, we consider only the evidence and inferences that tend to support a finding

---

**2.** We cannot conclude that *Pentagon Enters.* actually decided the issue of standing to sue because its disposition of the case is inconsistent with the supreme court's conclusion that standing to sue is an issue of subject matter jurisdiction. *See Tex. Ass'n of Bus.,* 852 S.W.2d at 443–46. If a plaintiff lacks standing to sue, the court must dismiss the case for lack of jurisdiction. *See Delp,* 987 S.W.2d at 882. It cannot issue a take-nothing judgment. *See id.* In *Pentagon Enters.,* the court affirmed a judgment *non obstante veredicto* by which the plaintiff was ordered to take nothing by its claim. *Pentagon Enters.,* 540 S.W.2d at 478. This is inconsistent with the case being decided on the basis of standing to sue. The more plausible explanation for the disposition is that the court of appeals affirmed the take-nothing judgment because, as a matter of law, the plaintiff could not recover damages for a trespass that occurred before it had any interest in the property.

and disregard all evidence and inferences to the contrary. *N. Am. Refractory Co. v. Easter*, 988 S.W.2d 904, 908 (Tex.App.-Corpus Christi 1999, pet. denied). If there is any evidence of probative force to support the finding (i.e., more than a mere scintilla), we will overrule the issue. *Id.*

## A. Malice

In its third issue, Coastal argues that the jury's finding of malice was not supported by legally sufficient evidence. Because appellees had the burden of proving malice by clear and convincing evidence, an elevated standard of proof, we apply a more exacting approach on appeal by looking at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *See In re J.F.C.*, 96 S.W.3d 256, 264–268 (Tex.2002); *see also Southwestern Bell Tel. Co. v. Garza,*164 S.W.3d at 609–10 (2004).

The definition of malice given to the jury had two alternative prongs: a specific intent prong and a gross negligence prong. To prove specific intent, appellees had to show that Coastal specifically intended to cause them "substantial injury or harm." *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.001(7) (Vernon Supp.2004–05). To satisfy the gross negligence prong, appellees had to show that (1) when viewed objectively, Coastal's acts or omissions "involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others," and (2) Coastal had "actual subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others." *See id.* § 41.001(11).

Coastal argues that there is no evidence to support a finding of malice under either the specific intent or gross negligence prong. Coastal's appellate brief advances two main arguments: (1) evidence that Coastal's production department did not check the lease lines in designing the fracture stimulation does not support the malice finding, and (2) evidence that Coastal's land department knew about the fracture stimulation proposal does not support a finding of malice.

In response to Coastal's no-evidence challenge, appellees argue that Coastal's failure to check the location of the lease lines is, in fact, evidence of malice. Additionally, appellees reference ten points of evidence, which, they argue, support the jury's finding of malice:

1. Coastal conducted an intense fracture stimulation procedure on its Coastal Fee No. 1 well on Share 12, designed to encroach upon and drain Share 13.
2. Coastal voluntarily shut in its highly-successful Pennzoil No. 1 well in order to drill its Coastal Fee No. 1 well.
3. Coastal intended the fracture stimulation procedures to drain oil and gas from Share 13, and they performed as intended.
4. Coastal possessed an 84% ownership interest on Share 13, but later acquired a 100% interest on adjoining Share 12.
5. Despite its implied obligation to develop Share 13 after the completion of the M. Salinas No. 3, Coastal developed its Share 12 fee property, where its net revenue interest was 100%.
6. Coastal did not seek GET's consent before conducting the fracture stimulation procedures on the Coastal Fee No. 1 well.
7. In the design of the 1100' fracs implemented in the Coastal Fee No. 1 well, Coastal did not consider lease line boundaries.
8. Because of the instantaneous drainage along the fracture, Professor Eco-

nomides [ ˙ (appellees'. expert witness) ] calculated the drainage by trespass based upon the length of the fracture into Share 13. He estimated the value of that drainage to be $543,000.

9. Coastal drilled protection wells, albeit ineffective in both time and location, only after GET filed suit to protect its rights.

10. By the time Coastal drilled the protection wells, after litigation was commenced, the gas and gas condensate were already gone, having entered the fracture created in the Coastal Fee No. 1 well. These reserves could not be produced by a protection well.

In a separate, unnumbered point of evidence, appellees state that "Coastal implemented the largest 'frac jobs' in the field to maximize the possibility that its 'frac jobs' would cross into Share 13 and effect a drainage of the gas and gas condensate found there."

Coastal's reply brief asserts that appellees' evidence is "misleading." Coastal then proceeds to take issue with some of the evidentiary points enumerated by appellees. Coastal maintains that, contrary to appellees' characterization, "the·frac job performed on the Coastal Fee No. 1 was less effective than most of the frac jobs done on ... [appellees'] wells and, in fact, was one of the *least* effective in the field." Coastal also disputes appellees' assertion that it "intended the fracture and stimulation procedures to drain oil and gas from Share 13." According to Coastal, "The gist of this allegation is that if Coastal's

model predicted that the fracture would travel 1,164 feet, it must have done so." Coastal argues that such reasoning is flawed because the "design model was nòt intended to predict exactly what will occur in the field when the fracture treatment is implemented, but rather was used to compare the effectiveness of frac jobs on various wells." Coastal maintains that its model only calculated for the propped length and not the effective length of the fracture, which is always shorter than propped length.[3] Thus, according to Coastal, even if the proppant crossed the lease line, it does not necessarily mean that the fracture would drain oil and gas from the neighboring tract.

 We conclude that the record contains legally-sufficient evidence to establish Coastal's specific intent to cause substantial injury to appellees. Specific intent means that "the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to.result from it." *Reed Tool Co. v. Copelin,* 689 S.W.2d 404, 406 (Tex.1985) (quoting Restatement (Second) of Torts § 8A (1965)). Appellees' evidence of specific intent is mostly circumstantial, but this is not problematic because even purely circumstantial evidence can suffice to prove malice. *See Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex.1998).

Dr. Economides testified that the well fraced by Coastal is located 467 feet from Share 13, such that any fràcture treatment of the well exceeding between 467 and 660

---

**3.** There are at least four different ways to measure the distance of a hydraulic fracture. The first, referred to in this opinion simply as the "fracture length," is the "fracture half length," which refers to the length of one fracture wing from the wellbore to the tip. The second distance is known as the "hydraulic length." It is the portion of the "fracture half length" that is occupied by the liquid initially used to create the fracture. The third measure of distance is the "propped length," which is the portion of the fracture containing "proppant," the material (often a sand mixture) used to prop open the fracture. The fourth measure is the "effective length." It is the portion of the fracture that actually contributes to the flow of oil and gas.

feet in length (depending on the direction of the fracture) would penetrate Share 13. Dr. Economides also testified that, based on his calculations, as well as the stimulation proposals relied upon by Coastal, the fracture treatment performed by Coastal was designed to extend approximately 1,100 feet or more. In Dr. Economides' opinion, a "massive" fracture treatment such as the one performed by Coastal in this case would be the ideal way to "exploit" the reservoir of gas and gas condensate in Shares 12 and 13. Based on this evidence, the jury could have reasonably inferred that Coastal intended for its fracture treatment to penetrate and drain gas and gas condensate from Share 13. Furthermore, the jury could have also reasonably inferred that the drainage of gas and gas condensate from Share 13 would cause substantial injury to appellees in the form of a financial loss because appellees owned a royalty interest in the gas and gas condensate produced from Share 13 but had no such interest in Share 12.

Based on the evidence, a reasonable trier of fact could have formed a firm belief or conviction that Coastal acted with malice. *See In re J.F.C.*, 96 S.W.3d at 264–268. Because we hold that the jury's finding of malice is supported by legally-sufficient evidence of specific intent, we need not address the legal sufficiency of the evidence to prove that Coastal was grossly negligent, which was the alternative option for establishing malice. *See* TEX.R.APP. P. 47.1. Coastal's third issue is overruled.

### B. Felony Theft

In its fourth issue, Coastal argues that the punitive damages award must be drastically reduced because the statutory cap on punitive damages applies in this case. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008(b) (Vernon Supp.2004–05) (statutory cap on punitive damages). In order to avoid the statutory cap on punitive damages, appellees alleged that Coastal was guilty of felony theft.[4] This allegation required appellees to prove, beyond a reasonable doubt, that when Coastal fractured its well, it intended to and did unlawfully deprive appellees of their property in an amount in excess of $20,000. *See id.;* TEX. PENAL CODE ANN. § 31.03(e)(4)-(7) (Vernon Supp.2004–05) (felony theft). The jury's affirmative finding on this point removed the cap that otherwise would have limited any punitive damage award to $1,087,532, twice the actual economic damages awarded for trespass. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008(b), (c)(13).

On appeal, Coastal argues that the trial court should have applied the cap because there is no evidence that Coastal's intent in fracing its well was to deprive appellees unlawfully of their property. According to Coastal, the evidence overwhelmingly demonstrated that all area wells must be fraced to be productive and Coastal's sole intent was to allow the well to be productive.

We disagree. We have concluded that there is more than a scintilla of evidence in the record to prove that Coastal acted with specific intent to cause a substantial injury by draining gas and gas condensate from Share 13, thereby diminishing appellees' royalties and causing them to incur a fi-

---

4. Section 41.008 provides in relevant part:
 This section does not apply to a cause of action against a defendant from whom a plaintiff seeks recovery of exemplary damages based on conduct described as a felony in the ... Penal Code if ... the conduct was committed knowingly or intentionally:

 (13) Chapter 31 (theft) the punishment level for which is a felony of the third degree or higher;
 *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.008(c)(13).

nancial loss exceeding half-a-million dollars. The jury's award of damages in the amount of $543,776 establishes that the value of the property taken from appellees exceeded $20,000. Based on this evidence a reasonable finder of fact could have formed a firm belief or conviction that when Coastal fractured its well, it intended to and did unlawfully deprive appellees of their property in an amount in excess of $20,000. *See* Tex. Penal Code Ann. § 31.03(e)(4)-(7). We therefore overrule Coastal's fourth issue.

### C. Bad Faith Pooling

In its fifth issue, Coastal challenges the jury's finding that it breached its contractual duty to pool in good faith, for which the jury awarded appellees $1 million (subsequently reduced to $81,619). The leases executed between Coastal and appellees granted Coastal the authority to combine or "pool" tracts from two or more leases into a single unit. *See Southeastern Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex.1999) ("A lessee has no power to pool without the lessor's express authorization, which is usually contained in the lease's pooling clause."). The primary legal consequence of pooling is that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit. *Id.* If the lessee pools in good faith, the lessee is relieved of the obligation to reasonably develop each tract separately, or to drill off-set wells on other tracts included in the unit to prevent drainage by a well on one or more of such tracts. *Id.* In other words, there can no longer be drainage of the individual leases by a unit well, only drainage of the unit by wells located outside the unit. *Id.* Conversely, if the unit is not pooled in good faith, production will be considered to take place only on the actual tract upon which it occurs, and production from a unit well will not maintain

off-site leases. *Id.* Generally, the question of good faith or bad faith pooling and unitization is a fact issue to be resolved by the trier of fact. *Circle Dot Ranch v. Sidwell Oil & Gas*, 891 S.W.2d 342, 347 (Tex.App.-Amarillo 1995, writ denied).

Coastal asserts that the jury's finding of bad faith pooling is supported by no evidence; however, John Wilson, an expert witness for appellees, testified that Coastal formed a pooled unit in a manner that financially penalized appellees, even though there were other ways to pool without creating such a penalty. Wilson also testified that the penalty incurred by appellees directly benefitted Coastal.

We agree with the Amarillo court's conclusion that a lessee should not be required to subordinate its own interests entirely to the interests of the lessor, *Elliott v. Davis*, 553 S.W.2d 223, 226 (Tex. App.-Amarillo 1977, writ ref'd n.r.e.), but at the same time, we believe it is equally important that a lessee be prohibited from subordinating the lessor's interests entirely to its own when it comes to the duty of good faith pooling. As the court stated in *Circle Dot Ranch*, "the lessee's primary obligation is to exercise the pooling power in good faith, taking into account the interests of *both* lessee and lessor." *Circle Dot Ranch*, 891 S.W.2d at 346 (emphasis added, internal quotations and citations omitted). The evidence favoring the jury's finding of bad faith pooling tends to prove that Coastal did not adequately consider the financial interests of appellees in exercising its pooling power. This is more than a scintilla of evidence of bad faith pooling. Coastal's fifth issue is therefore overruled.

### IV. Punitive Damages

Coastal's sixth and seventh issues challenge the jury's award of punitive dam-

ages. In its sixth issue, Coastal argues that punitive damages were not recoverable in this case because there was no award of tort damages. In its seventh issue, Coastal argues that the jury's award of punitive damages violates its due process rights under the United States Constitution.

## A. Availability of Punitive Damages

 Punitive damages cannot be recovered without a finding of an independent tort and an award of actual tort damages. *See Fed. Express Corp. v. Dutschmann,* 846 S.W.2d 282, 284 (Tex. 1993). According to Coastal, appellees were not entitled to an award of punitive damages because they failed to submit a question on the damages caused by Coastal's alleged trespass. The trial court submitted the following question on damages:

**QUESTION NO. 8:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiffs for the damages proximately caused by the Defendant's failure to prevent substantial drainage from the Salinas Lease caused by the trespass?

Consider the following elements of damages, if any, and none other:

The value of the royalty on the gas drained from Share 13 by the subsurface trespass from the Coastal Fee No. 1 well.

 Coastal argues that Question 8 did not inquire about damages for Coastal's alleged conduct as trespasser, but instead sought contract damages caused by Coastal's breach of the contractual covenant to protect against drainage, a covenant that was implied in its oil and gas lease contract on Share 13. This is confirmed, according to Coastal, by Question 8's dependence on Question 7, which asked whether Coastal "failed to act as a reasonably pru-

dent operator to prevent substantial drainage . . . caused by the subsurface trespass by fracture treatment. . . ." Coastal argues that the jury's award of damages in response to Question 8 was based on in its finding in Question 7 that Coastal breached the implied covenant to protect against drainage, not its allegedly tortious conduct as an adjoining landowner.

We find it significant that Questions 7 and 8 were each conditioned on a "yes" answer to Question 6, which asked whether "there has been substantial drainage of gas and gas condensate . . . caused by the subsurface trespass from the fracture treatment. . . ." As the jury's affirmative findings demonstrate, Coastal's trespass caused substantial drainage of gas and gas condensate from Share 13. These are the damages that Question 8 measured and awarded.

The tort and contract damages in this case necessarily overlap because Coastal played two different roles in causing the damages incurred by appellees: As an adjoining landowner, Coastal trespassed onto Share 13, and as the lessee of Share 13, it failed to protect against the substantial drainage caused by its trespass. Although Coastal's two different roles created two distinct injuries, one sounding in tort and one sounding in contract, the damages from both injuries are the same: diminished royalties caused by the drainage of gas and gas condensate from Share 13. Not only are the damages the same, they are inseparably linked to the two different injuries that caused them. If, on the one hand, Coastal had not trespassed onto Share 13, there would have been no drainage to protect against and therefore no contract damages for failure to protect against drainage. If, on the other hand, Coastal had protected against the drainage, its trespass would have been harmless, causing no tort damages for trespass.

For this reason, we conclude that the jury's answer to Question 8 constituted an award of actual tort damages and overrule Coastal's sixth issue.

## B. Due Process

▮▮▮▮▮ The Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a "grossly excessive" punishment on a tortfeasor. *BMW of N. Am. v. Gore*, 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (quoting *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 454, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)). Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition. *Id.* at 568. States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. *Id.* Only when an award can fairly be categorized as "grossly excessive" in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment. *Id.*

Elementary notions of fairness enshrined in the constitutional jurisprudence of the United States Supreme Court dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose. *Id.* at 574, 116 S.Ct. 1589. Three guideposts have been used by the high Court: (1) the degree of reprehensibility of the conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil or criminal penalties authorized or imposed in comparable cases. *Id.* at 575, 116 S.Ct. 1589. Our de novo application of these three guideposts to the facts of this case follows. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ("appellate courts ... [must] conduct [a] de novo review of ... the jury's award").

### *Degree of Reprehensibility*

▮▮▮▮▮ Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. Exemplary damages imposed on a defendant should reflect "the enormity of his offense." *Id.* (quoting *Day v. Woodworth*, 54 U.S. 363, 13 How. 363, 371, 14 L.Ed. 181 (1852)). This principle reflects the accepted view that some wrongs are more blameworthy than others. *Id.* Thus, the Supreme Court has noted that " 'trickery and deceit' are more reprehensible than negligence." *See id.* at 576, 116 S.Ct. 1589 (internal citation omitted). The high Court has also explained that intentional malice can be the decisive element in a "close and difficult case." *See id.*

▮▮▮▮ Although Coastal's conduct did not cause physical injury, it did involve a substantial amount of economic harm. Coastal breached its contract and committed the intentional tort of trespass. It acted with malice, and its conduct amounted to felony theft. Furthermore, the harm inflicted on appellees was possible only because Coastal abused its dual roles as lessee and adjacent landowner. Given these considerations, we conclude that Coastal's conduct was sufficiently repugnant to justify a punitive damages award befitting a substantial degree of reprehensibility.

### *Ratio*

The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to

the actual harm inflicted on the plaintiff. *Id.* at 580, 116 S.Ct. 1589. The Supreme Court has consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. *See id.* at 582, 116 S.Ct. 1589.

■■■ The ratio in this case is approximately 20 to 1. It is markedly lower than both the 500 to 1 ratio rejected in *Gore* and the 145 to 1 ratio rejected in *Campbell. See Campbell,* 538 U.S. at 425, 123 S.Ct. 1513; *Gore,* 517 U.S. at 582, 116 S.Ct. 1589. Admittedly, it exceeds the "single-digit multipliers," which, according to the Supreme Court, "are more likely to comport with due process," *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513; however, the Supreme Court has clarified that such "ratios are not binding ... [but] instructive." *Id.* Thus, the precise award in any case must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff, not a bright-line rule forbidding ratios exceeding 10 to 1. *See id.* Although the harm suffered by appellees may have been compensated by the jury's award of damages, the highly unlawful nature of Coastal's conduct (it being a breach of contract, an intentional tort, and felony theft) prevents this Court from concluding that the ratio 20 to 1 was grossly excessive.

### *Sanctions for Comparable Misconduct*

■■■ Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness. *Gore,* 517 U.S. at 583, 116 S.Ct. 1589. This third guidepost proves to be the least helpful in this case because we have been cited to no cases involving comparable misconduct. Apparently, appellees are the first plaintiffs in Texas to have

successfully asserted a cause of action for subsurface trespass by hydraulic fracture stimulation treatment of an oil and gas well. We therefore have no judgments in similar cases to which we can compare the damages awarded in this case.

The criminal penalties for felony theft, in contrast, are defined by statute. Theft of property exceeding $200,000 is a first degree felony. *See* TEX. PENAL CODE ANN. § 31.03(e)(7) (Vernon Supp.2004–05). An individual who commits felony theft is subject to imprisonment for a term ranging from 5 to 99 years, in addition to a fine not to exceed $10,000. *See* TEX. PENAL CODE ANN. § 12.32 (Vernon 2003). Coastal, being a corporate entity and not an individual, would be subject to a fine not to exceed twice the amount gained or caused to be lost or damaged, whichever is greater. *See* TEX. PENAL CODE ANN. § 12.51 (Vernon 2003). That amount would be $1,086,000.

The maximum fine Coastal could be subjected to if prosecuted for felony theft is much lower than the $10 million award of punitive damages, but this disparity, while noteworthy, is the product of a comparison of dubious utility. Coastal breached its contract, trespassed, and committed felony theft, but only one of these illegalities is accounted for in a comparison between the punishment for felony theft and the punitive damages award in this case. Without the benefit of more complete information on which to base an adequate comparison, this Court cannot conclude that the third guidepost militates towards a finding of gross excessiveness.

On balance, the factors by which the United States Supreme Court has instructed appellate courts to evaluate awards of punitive damages tend to favor a conclusion that the damages awarded in this case are not grossly excessive and do not violate the Fourteenth Amendment's guaran-

tee of substantive due process. Coastal's seventh issue is therefore overruled.

## V. Damages

Coastal's eighth and ninth issues challenge the measures of damages submitted to the jury for appellees' claims for failure to protect against substantial drainage and failure to develop the leasehold.

### A. Failure to Protect Against Substantial Drainage

As mentioned above, *supra* IV. A., the trial court submitted one question on damages that encompassed the damages from both the alleged trespass and the alleged failure to protect against substantial drainage. Coastal argues the jury's award of damages for failure to protect against substantial drainage must be reversed and rendered in its favor because the measure of damages stated in Question 8 was improper for failure to protect against substantial drainage, though it may have been the proper measure for trespass. We disagree that a reversal is in order. *See* Tex.R.App. P. 44.1(a).

Although the measure of damages stated in Question 8 might have been improper for a claim of failure to protect against substantial drainage, Coastal does not challenge the instruction as a measure of damages for trespass. In deciding Coastal's sixth issue, we concluded that Question 8 measured appellees' trespass damages. Because Coastal has not challenged Question 8 as a measure of damages for trespass, we cannot conclude that the error of which Coastal complains probably led to the rendition of an improper judgment. *See id.* Coastal's eighth issue is overruled.

### B. Failure to Develop the Leasehold

■ Coastal also complains that the trial court erred by instructing the jury that the measure of damages for breach of

the implied covenant to develop was the "value of the interest income on the royalty amount lost to Plaintiffs, if any, through the lessee's failure to reasonably develop the Salinas Lease." According to Coastal, this instruction runs counter to longstanding Texas law, which holds that the measure of damages for failure to develop is the difference between the royalty that was actually paid and the royalty that should have been paid had the lessee exercised ordinary care to develop the lease (the "royalty rule"). *See Tex. Pac. Coal & Oil Co. v. Barker*, 117 Tex. 418, 6 S.W.2d 1031, 1038 (1928) (discussing other cases that "announce the correct doctrine which requires the lessee to pay the lessor the amount he actually loses by awarding him without deduction the full value of royalty lost to him through the lessee's failure to exercise ordinary care to ... develop the minerals in the leased premises"). The gist of Coastal's complaint is that "the trial court should have instructed the jury to apply the *Barker* royalty rule and then allowed Coastal a dollar-for-dollar credit for the royalties it paid. . . ." Coastal maintains that "it should not be required to pay the royalty again when development took place. . . ."

■ The trial court's measure of damages did not run afoul of supreme court precedent. A lessee's obligations in the performance of the implied covenants as to development, operation, equipping and marketing are measured by the same rule, reasonable diligence, or what an ordinarily prudent and diligent operator would do. *Rhoads Drilling Co. v. Allred*, 123 Tex. 229, 70 S.W.2d 576, 585 (1934). Should it be found that the lessees or their assigns failed to exercise reasonable care in exploring, developing, or producing the oil and gas in the leased land, the parties or party in default would be liable to the lessors for the damages thereby sustained.

*Mon–Tex Corp. v. Poteet,* 118 Tex. 546, 19 S.W.2d 32, 34 (1929).

The jury found that Coastal failed to act with reasonable diligence—failed to act as an ordinarily prudent and diligent operator—in its development of Share 13. The evidence in support of this finding tended to prove that Coastal delayed unreasonably in developing the tract, a delay which, according to appellees' expert witness, cost appellees $2,292,513 in lost interest income. A damages award such as the one advocated by Coastal, based on the difference between royalties actually received and royalties that should have been produced, would not at all account for the damages sustained by appellees, as the leasehold was eventually developed after the commencement of this suit. Application of Coastal's measure of damages would have contradicted the supreme court's holding in *Poteet* that a party in breach of an implied covenant is "liable to the lessors for the damages thereby sustained." *See id.* As the *Barker* court stated, "the correct [measure] . . . requires the lessee to pay the lessor the amount he actually loses. . . ." *Barker,* 6 S.W.2d at 1038. The amount lost by appellees is the interest income on the delayed royalties. That is the amount measured by the jury's instruction. The jury's award of damages did not force Coastal to pay royalties twice; it awarded appellees interest on the royalties appellees would have received if Coastal had not breached the implied covenant to develop the leasehold. *Accord Freeport Sulphur Co. v. Am. Sulphur Royalty Co.,* 117 Tex. 439, 6 S.W.2d 1039, 1045 (1928) (allowing the recovery of interest income on royalties that were delayed). Coastal's ninth issue is overruled.

## VI. Admissibility of 1977 Memorandum

In its tenth issue, Coastal complains that the trial court erred by admitting into evidence an internal memorandum written by a Coastal employee in 1977. We must uphold the trial court's admission of the 1977 memo if there is any legitimate basis for the ruling, *see Torrington Co. v. Stutzman,* 46 S.W.3d 829, 845 n. 13 (Tex.2000), because the admission of evidence is a matter committed to the trial court's sound discretion. *Interstate Northborough P'ship v. State,* 66 S.W.3d 213, 220 (Tex.2001). We cannot reverse a trial court's ruling for an abuse of discretion merely because we may disagree with that decision. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991).

### A. Relevancy

Coastal argues that the 1977 memo was inadmissable because it was not relevant. *See* Tex.R. Evid. 402. ("Evidence which is not relevant is inadmissible."). Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Stutzman,* 46 S.W.3d at 845 n. 13 (citing Tex.R. Evid. 401). To be relevant, in other words, the proposed testimony must be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Gammill v. Jack Williams Chevrolet,* 972 S.W.2d 713, 720 (Tex.1998). Testimony that is inadmissible in the first instance may become relevant and admissible in rebuttal, but the alleged rebuttal evidence must be in fact offered to rebut other evidence, not as a part of the proponent's case-in-chief. *See Waldrep v. Tex. Emplrs. Ins. Assoc.,* 21 S.W.3d 692, 706 (Tex.App.-Austin 2000, pet. denied).

The 1977 memo was irrelevant, according to Coastal, because it dealt only

with title issues related to Share 13, issues which, according to Coastal, were not litigated in the instant case. At trial, Coastal raised title issues as a defensive theory to appellees' failure-to-develop claim, but the title issues involved Share 15, which is located on a tract of land adjacent to Share 13. As with Share 13, Coastal owns Share 15's mineral estate but not its surface rights. The surface rights are held by the Coates family, which also holds a royalty interest in the mineral estate.

Coastal raised the title problems with Share 15 as follows. In the portion of her opening statement related to appellees' claim for failure to develop the leasehold, counsel for Coastal contended that "title disputes [to Share 15] had been going on" and that Coastal "wasn't able to simply drill down here [on Share 13] until some things got resolved.... There were [title] problems that Coastal had been trying to resolve for a long time and all they did was get sucked into lawsuits trying to do it." To prove this contention at trial, Coastal presented the testimony of Steve Salge, its director of land for the district of south Texas. Salge testified that Coastal's delay in developing Share 13 was caused by complications related to title issues involving Share 15. Salge testified that Coastal was "trying to cure up [these] title issues so that we could actually drill some additional wells, specifically, it would have been those wells located along the-where the 5, 7, and 8 are and then eventually the 10 and 11 because we had-we had some title concerns up there that previously had hindered the drilling of those wells."

Even though Coastal raised title issues as a defensive theory to appellees' failure-to-develop claim, it argues that the 1977 memo was nonetheless irrelevant because

it discussed title problems related to Share 13, not Share 15. These two groups of title problems, Coastal argues, are completely unrelated.

We disagree with Coastal on this point. Although the disputes in question are undoubtedly distinct, both legally and factually, each is relevant to a central issue of this case: the reasonableness of Coastal's failure to develop Share 13 because of title problems. In the 1977 memo, a Coastal employee recommended that, despite the title problems with Share 13, Coastal should "assume the calculated risks of drilling ... [a] well [on Share 13]." The memo further advised that "if ... [the well] is a producer we can file an interpleader suit and let the court decide which parties are entitled to royalties and the percentages." Thus, the memo can be fairly characterized as stating that development of Share 13 would be reasonable despite any title problems.[5] We conclude that the 1977 memo was relevant because its recommendation to drill despite title problems could have helped the jury to decide whether Coastal was reasonable in delaying its development of Share 13 because of title problems with Share 15. In reaching this conclusion, we emphasize that we do not review the admission of evidence de novo but are instead restricted to an abuse-of-discretion standard under which we cannot reverse the trial court's ruling simply because we would have reached the opposite conclusion. *See Buller*, 806 S.W.2d at 226.

## B. Unfair Prejudice

■ Coastal further contends that even if the 1977 memo is held to be relevant, the trial court nonetheless erred by admitting it because it was unfairly preju-

---

5. At trial, appellees introduced into evidence a judgment entered in 1982 on an interpleader suit filed by Coastal, presumably in response to the 1977 memo. The judgment determined, *inter alia*, ownership of the royalty interests to Share 13's mineral estate.

dicial. *See* Tex.R. Evid. 403. In particular, Coastal argues that the following passage from the memo caused it to be "tried ... for racism":

> The complex problems encountered by Mr. Slator result from the fact that possession of these lands began over 200 years ago and the people in possession were mostly illiterate Mexicans and later Mexican–Americans who had large families, many estate problems, heirship problems and errors of all kinds involving surveys and resurveys, partitions and attempted partitions.

Coastal contends that the language about "illiterate Mexicans" was offered specifically for its potential to create prejudice, confuse the issues, and mislead the jury.

 All relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Tex.R. Evid. 403; *Easter*, 988 S.W.2d at 916. Rule 403 thus requires the trial court to conduct a balancing test to determine whether the proffered evidence is admissible. *TCA Bldg. Co. v. Northwestern Res. Co.*, 922 S.W.2d 629, 637 (Tex.App.-Waco 1996, writ denied). Rule 403's balancing test generally comes into play when the probative value of the evidence is low or the problems with the evidence are serious. *Farr v. Wright*, 833 S.W.2d 597, 602 (Tex.App.-Corpus Christi 1992, writ denied).

We have concluded that the 1977 memo was probative of Coastal's unreasonableness in delaying production of Share 13 because of title problems with Share 15. The memo showed that previous title problems had not hindered Coastal's development of Share 13, even when the title problems dealt with Share 13, the actual tract of land which was to be developed. Although the title problems raised as a defense by Coastal involved a different tract of land, this distinction militates (if at all) against the reasonableness of Coastal's delay in developing Share 13.

 Next, we must balance the probative value of the 1977 memo against the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Tex.R. Evid. 403; *Easter*, 988 S.W.2d at 916. Unfair prejudice is an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one. *Weidner v. Sanchez*, 14 S.W.3d 353, 365 (Tex. App.-Houston [14th Dist.] 2000, no pet.). Coastal characterizes the 1977 memo as an illicit use of race to gain courtroom advantage. To prove that the use of race is unfairly prejudicial, Coastal makes the following argument with which this Court wholeheartedly agrees:

> In Texas, you can't say you should win because your adversaries are "yellow nigs" or "yellow darkies." *Tex. Employers' Ins. Ass'n v. Haywood* [153 Tex. 242], 266 S.W.2d 856, 858–59 (Tex.1954). You can't argue that a witness would lie for money because he is a Jew. *See Tex. Employers' Ins. Asso. v. Jones*, 361 S.W.2d 725, 727 (Tex.Civ.App.-Waco 1962, writ ref'd n.r.e.). You can't say that Americans should not lose their case to aliens. *See Penate v. Berry*, 348 S.W.2d 167, 168 (Tex.Civ.App.-El Paso 1961, writ ref'd n.r.e.). You can't call your opponent a wetback. *See Basanez v. Union Bus Lines*, 132 S.W.2d 432, 433 (Tex.Civ.App.-San Antonio 1939, no writ). And you can't appeal to jurors for ethnic unity based on a shared Hispanic heritage. *See Tex. Employers' Ins. Ass'n v. Guerrero*, 800 S.W.2d 859, 862–63 (Tex.App.-San Antonio 1990, writ denied).

Although we agree that courtroom strategies appealing to racial or ethnic biases are highly improper and unfairly prejudicial,

we cannot conclude that the memo's language about "illiterate Mexicans" is anywhere near as inflammatory as the remarks made in the cases cited by Coastal. The memo simply cannot be considered "an appeal to ... prejudice in language clear and strong," *Berry,* 348 S.W.2d at 168–69, especially because it was written by a Coastal employee and did not ask the jury to decide the case on an improper basis as did the arguments made in the cases cited by Coastal. For this reason, we cannot conclude that the trial court abused its discretion by admitting the memo over Coastal's objection of unfair prejudice.

■ In support of its tenth issue, Coastal raises two collateral arguments, which this Court is compelled to address. It argues that the memo's danger of unfair prejudice was magnified by the testimony of appellee Margarito Salinas that he was "insulted," "infuriated," and "really, really mad" about the "illiterate Mexicans" language because it was "my ancestors" who were being insulted. Salinas also testified that the rest of his family members "feel ... the same way. They feel hurt. They feel infuriated."

The foregoing testimony may have been held inadmissible on several grounds, the most obvious of which being relevancy, *see* Tex.R. Evid. 401, 402, but Coastal made no such objections at trial. Coastal's motion for new trial likewise failed to raise any objection to the testimony. Although Coastal's tenth issue complains only of the admission of the 1977 memo, Coastal buttresses this alleged error with the additional error of allowing testimony by Salinas that was equally as objectionable by Coastal's reasoning. Salinas's testimony that his ancestors were "insulted" by the memo and that he was "infuriated" by it appears just as prejudicial as, if not more prejudicial than, the memo's description of

the original landowners as "illiterate Mexicans," language which could conceivably be an accurate, though potentially prejudicial, description. We agree that Salinas's testimony magnified whatever prejudicial danger the memo presented, but we conclude that this heightened threat of unfair prejudice should not be considered in the rule 403 balancing test because Salinas's testimony was not objected to at trial. Any error related to Salinas's testimony was not preserved for appellate review. *See* Tex.R.App. P. 33.1(a).

■ Coastal also argues that the danger of the memo having a prejudicial effect was increased by appellees' closing argument. Counsel for appellees argued that the memo "shows [Coastal's] attitude." He characterized Coastal as "this $10 billion corporation that didn't care enough to bring in the person that actually wrote the memo or received the memo so they can tell you what they really meant. Why are they referring to ... illiterate Mexicans?"

As with Salinas's testimony, Coastal made no objections to counsel's closing argument. Coastal has not raised improper jury argument as a separate issue on appeal. Instead, it appeals only the admission of the 1977 memo and has attempted to demonstrate the memo's prejudicial effect by referencing counsel's closing argument.

Although we firmly believe that appeals to racial or ethnic biases are contemptible practices and are unfairly prejudicial, we cannot conclude that the closing argument made by appellees' counsel crossed into this forbidden realm. Instead, we hold that the closing argument by appellees' counsel did not increase the danger of unfair prejudice presented by the memo. Our review of the trial court's rule 403 balancing test is therefore not influenced by the appellees' closing argument.

In the cases cited by Coastal, the improper arguments made by counsel were unmistakably designed to gain courtroom advantage by capitalizing on racial or ethnic biases.[6] They were not mere references to race or ethnicity; they were suggestions that the case be decided based on improper considerations.[7] In contrast, appellees' closing argument did not ask the jury to decide the case based on racial or ethnic biases; it recapped the evidence and responded to the calls for ethnic unity made by Coastal during its closing argument. The following excerpts are the most notable portions of Coastal's closing argument:

> I came up here to talk to you about one thing. I came up here to talk to you about a departmental memo that referred to the term "illiterate Mexican." You heard Mr. Salinas testify that he was offended by the term illiterate Mexican. I'm sure some of you may have been offended by the term illiterate Mexican. I want to tell you that I'm offended by the term illiterate Mexican ... We all know that our ancestors, our pioneering ancestors, were people that were more about the land and not peo-

ple of the letter. The reason this came about is because this term was used and this term was offensive, but way back then our people knew the land. Our people knew things that pertained to the land. Our people knew cattle. Our people knew the game and the wildlife. Our people knew farming. Our people knew ranching. Nobody cared to read or write. That wasn't an insult. That's just the way it was. We survived. And how did we survive? We survived through knowing the land, through using the land. That's how we were able to overcome ... And 200 years ago, ladies and gentleman, I would almost guarantee you that 80 percent of the *gringos* were illiterate ... Along with their lawyers, the Plaintiffs have been enriched in this case. *"Nadie esta en la calle."* Nobody is in the street, not the lawyers, not the Plaintiffs ... I am proud to be a Mexican American. I am proud to come from Mexican ancestry. That ancestry settled this country. That ancestry fought. That ancestry was courageous. And because of that ancestry, I'm here and a lot of us are here today.

6. In *Haywood*, for example, counsel argued as follows:
> [W]hy then didn't they bring the superintendent (of Shaw's garage) or bring some white fellow that you could see and know was telling the truth? * * * It looks to me like it would have been awful easy to have brought some white fellows that had their cars worked on or somebody that you could believe. Is that the way you would do it? That's common sense. I wouldn't fly a couple of those yellow nigs in here and expect the jury to believe that kind of stuff.

*Haywood*, 153 Tex. at 244, 266 S.W.2d at 858. In holding this argument amounted to reversible error, the supreme court concluded that such arguments could not be made "without implanting in the minds of the jurors the deepest and most ineradicable type of prejudice." *Id* at 246, 266 S.W.2d 856.

7. For instance, in *Jones*, the court concluded that counsel's argument "was an appeal to racial and religious prejudice in language clear and strong. Moreover, it tied racial and religious prejudice in with the charge that Dr. Frieburg would falsify [testimony] for money." *See Jones*, 361 S.W.2d at 727. Similarly, in *Berry*, counsel's argument suggested that the jury decide the case based on the plaintiff's nationality: "[Y]ou see, it just so happens that in this country you can't come into court and reach your hands into the pockets of an American citizen and take his property from him—not for an alien...." *Berry*, 348 S.W.2d at 168; *see also Basanez*, 132 S.W.2d at 433 (holding that counsel's argument "sought a verdict upon the premise that appellants were not citizens of the United States, as were the jury and the appellee").

According to this Court's tally, counsel for Coastal used the term "our people" no less than six times and the term "we" (meaning Mexican Americans) at least four times. Counsel referenced and relied upon his common Hispanic "ancestry" throughout his argument, going so far as to use a Spanish epithet to describe Anglos (i.e., "*gringos*"). In sum, Coastal's closing argument was ostensibly designed to align the jury to Coastal's counsel based on a shared Hispanic heritage. But as Coastal acknowledged in its appellate brief, "you can't appeal to jurors for ethnic unity based on a shared Hispanic heritage." *See Guerrero*, 800 S.W.2d at 862–63.

According to Coastal, its closing argument was necessary to mitigate the prejudicial effect of the 1977 memo. We disagree. An objection to Salinas's testimony would have markedly offset the prejudicial danger of the memo rather than adding to it, but no such objection was made. Instead, Coastal attempted to use the jury's Hispanic heritage to its advantage by having its Hispanic counsel call for ethnic unity during closing argument.

In sum, we find that Coastal brings its tenth issue with unclean hands, for it is guilty of the very wrong of which it complains. Although we are not influenced by any theories such as "opening the door" or "estoppel," we find it noteworthy that appellees' closing argument was made in express response to the objectionable portions of Coastal's closing argument. Our disposition of this issue, however, hinges not on Coastal's calls for ethnic unity but on our inability to conclude, based on the facts of this case, that the trial court's admission of the 1977 memo amounted to an abuse of discretion. The trial court balanced the probative value of the memo against the danger of unfair prejudice and concluded that the balance favored admission of the memo. We have reached the same conclusion, and in disposing of this issue, we note that even if we had not reached the same conclusion, we would not necessarily be able to find an abuse of discretion. *Buller*, 806 S.W.2d at 226 (stating that appellate court cannot reverse trial court's ruling for abuse of discretion merely because it may disagree with that decision). Coastal's tenth issue is overruled.

## VII. Plea in Abatement

■ In its eleventh issue, Coastal contends that the trial court erred by failing to abate this suit in favor of an earlier-filed suit. According to Coastal, the claims asserted by appellees in this case are identical to the claims in two earlier suits filed in Hidalgo County by essentially the same parties. For this reason, Coastal moved to abate the present suit in favor of the first-filed of the earlier suits, but the trial court denied Coastal's plea in abatement.

■ Abatement of a lawsuit due to the pendency of a prior suit is based on the principles of comity, convenience, and the necessity for an orderly procedure in the trial of contested issues. *Wyatt v. Shaw Plumbing Co.*, 760 S.W.2d 245, 248 (Tex.1988). When an inherent interrelation of the subject matter exists in two pending lawsuits, a plea in abatement in the second action must be granted. *Id.* at 247. It is not required that the exact issues and all the parties be included in the first action before the second is filed, provided that the claim in the first suit may be amended to bring in all necessary and proper parties and issues. *Id.* In determining whether an inherent interrelationship exists, courts should be guided by the rule governing persons to be joined if feasible and the compulsory counterclaim rule. *Id.* (citing TEX.R. CIV. P. 39 (joinder of parties), 97(a) (compulsory counterclaims)).

This lawsuit was filed in 1997 in the 206th District Court of Hidalgo County by Garza Energy Trust and members of the Garza and Salinas families, two branches of the same family tree. Previously, in 1988, the Garza Energy Trust and members of the Garza family had filed claims in the 370th District Court of Hidalgo County ("*Garza I*") against Coastal and over twenty other defendants,[8] and in 1995, the Salinas plaintiffs filed claims in the 93rd District Court of Hidalgo County ("*Salinas*") against Coastal and over thirty other defendants.[9]

The three lawsuits are similar in some respects, though the earlier-filed suits clearly involved more defendants than the latter suit. Each lawsuit involves (1) Share 13, (2) mineral leases of Share 13 executed between appellees and Coastal, (3) claims for breach of the implied covenants to protect against drainage and to develop the leasehold, and (4) drainage of gas and gas condensate from Share 13 because of fracture treatments on wells located on adjoining tracts of land. *Garza I* differs from the other two suits because it involves a title dispute over Share 15.

Coastal contends that this lawsuit ("*Garza II*") should have been abated in favor of *Garza I* because it involves the same parties and the same controversy. According to Coastal, appellees filed *Garza II* in the 206th District Court so they could have a friendlier forum than the 370th District Court. On December 9, 1996, the 370th District Court signed a summary judgment against the *Garza I* plaintiffs on their title claims to Share 15. The trial court then severed the title claims, render-ing the summary judgment order final and appealable, and ordered the remaining claims abated until "after all appeals" of the summary judgment.[10]

Coastal alleges that the trial court erred by denying abatement of *Garza II* because appellees have "conceded that ... [the] requirements [for abatement] have been or could be satisfied." This statement is unsupported by the record. In fact, the opposite is true: Appellees have consistently argued that abatement of *Garza II* was unnecessary and improper because the claims at issue in *Garza I* are different from the claims asserted in *Garza II*. We agree with appellees on this point.

The *Garza I* suit complained about drainage caused by Coastal's fracture treatment on a well located on Share 15. In contrast, the *Garza II* suit complained about drainage caused by Coastal's fracture treatment on a well located on Share 12. Not only do the two cases involve entirely different incidents of drainage, different tracts of land, different wells, and different damages, the drainage in each suit took place at very different times. The *Garza I* drainage allegedly began prior to 1988, whereas the *Garza II* drainage did not begin until 1996, when Coastal fraced the Coastal Fee No. 1 well located on Share 12.

This leaves the failure-to-develop claims. Each of these claims involved Share 13, and their allegations appear to be very similar: Coastal unreasonably delayed its development of the leasehold. Although the claims are hardly distinguishable, we note that *Garza II* resolved the failure-to-

---

**8.** *Garza I* is styled *Juan Lino Garza, et al. v. Elizabeth H. Coates Maddux, et al.*, No. C–035–88–G.

**9.** *Salinas* is styled *Amelia Garza de Salinas, et al. v. Elizabeth H. Coates Maddux, et al.*, No. C–6239–95–B.

**10.** This Court affirmed the summary judgment in *Garza v. Maddux*, 988 S.W.2d 280, 291 (Tex.App.-Corpus Christi 1999, pet. denied).

develop controversy only from 1993 to present. The *Garza II* jury was asked whether "Defendants failed to reasonably develop the Salinas Lease after production was obtained after 1993." In contrast, *Garza I* sought damages for Coastal's failure to develop beginning in 1980. Thus, *Garza II* did not resolve the failure-to-develop issue raised by *Garza I* but actually resolved the issue as it unfolded years after *Garza I* was filed.

Because we conclude that the *Garza I* and *Garza II* claims are different, we next consider whether there is a inherent interrelation of the subject matter of the suits by reference to the compulsory counterclaim rule. *See id.* at 247. Texas Rule of Civil Procedure 97(a) dictates that a pleading shall assert a counterclaim if it meets six elements: (1) it is within the jurisdiction of the court; (2) it is not at the time of filing the answer the subject of a pending action; (3) the action is mature and owned by the pleader at the time of filing the answer; (4) it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; (5) it is against an opposing party in the same capacity; and (6) it does not require for its adjudication the presence of third parties over whom the court cannot acquire jurisdiction. Tex.R. Civ. P. 97(a). The *Garza II* claims do not meet the third prong of the compulsory counterclaim rule: they were not mature at the time of filing the answer because the drainage had not yet occurred and the damages sought for failure to develop (from 1993 forward) had not yet been incurred. *See Ingersoll–Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 207 (Tex.1999) ("A claim is mature when it has accrued."). Accordingly, we conclude that there is no inherent interrelation of the subject matter of the suits.

The duty to abate a lawsuit in favor of a pending prior proceeding arises as a consequence of the dominant jurisdiction rule, under which the court of earliest filing ascends to a position of dominance over all other courts of later filing. *See Miles v. Ford Motor Co.*, 914 S.W.2d 135, 138 (Tex.1995). There are three exceptions to the rule: (1) where a party has engaged in inequitable conduct that estops him or her from asserting prior active jurisdiction; (2) where there is a lack of persons to be joined if feasible, or the power to bring them before the court; and (3) where there is a lack of intent to prosecute the first proceeding. *Id.* Although we conclude that there is no inherent interrelation of the subject matter of the suits and, therefore, no duty to abate *Garza II* in favor of *Garza I*, we think the prolonged abatement of *Garza I* evidences a lack of intent to prosecute. This is especially true because *Garza I* was abated, on motion of the *Garza I* plaintiffs, until "after all appeals." "All appeals" ended on November 12, 1999, when the supreme court denied a motion for rehearing on a petition for discretionary review of this Court's judgment affirming the trial court's summary judgment against the *Garza I* plaintiffs.

The trial court did not err in denying Coastal's plea in abatement. We overrule Coastal's eleventh issue.

## VIII. Repudiation Instruction

In its twelfth issue, Coastal asserts that the trial court improperly refused to submit a jury instruction on its repudiation defense. Coastal argues that it presented evidence that appellees repudiated the leases on Share 13 from 1995 to 1997 by seeking a declaration in *Garza I* that the leases had terminated. *See NRG Exploration v. Rauch*, 671 S.W.2d 649, 652 (Tex.App.-Austin 1984, writ ref'd n.r.e.) ("A suit brought by a lessor to have the

lease terminated constitutes a repudiation."). According to Coastal, appellees' repudiation of the leases excused it from its contractual obligations to develop the leasehold, an issue which should have been submitted to the jury. *See King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 756 (Tex.2003) ("repudiation is often a fact question"). As the supreme court stated in *Ridge Oil:*

> The law is well-settled in Texas that "lessors who ... wrongfully repudiate the lessees' title by unqualified notice that the leases are forfeited or have terminated cannot complain if the latter suspend operations under the contract pending a determination of the controversy and will not be allowed to profit by their own wrong." A lessor's repudiation of a lease relieves the lessee "from any obligation to conduct any operations, drilling, re-working, or otherwise, on said land in order to maintain the lease in force pending the judicial determination of the controversy ... over the validity of the lease."

*Ridge Oil Co. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 157 (Tex.2004) (footnotes omitted).

Appellees argue that repudiation is a variation of promissory estoppel, a theory which requires a showing of detrimental reliance. *See Atl. Richfield Co. v. Hilton,* 437 S.W.2d 347, 353–55 (Tex.Civ.App.-Tyler 1969, writ denied n.r.e.). According to appellees, Coastal produced no evidence to show that it relied on the allegations of *Garza I* to the effect that the leases had terminated, and thus, a jury instruction on repudiation was not required as a matter of law. *See* Tex.R. Civ. P. 278 (stating that courts shall submit questions raised by written pleadings and evidence). In response, Coastal argues that there is no requirement of detrimental reliance for a defense based on repudiation.

We do not necessarily agree that detrimental reliance must be shown to prove the defense of repudiation, but the supreme court's statement in *Ridge Oil* specifies that any suspension in development of the leasehold must be related to the "judicial determination of the controversy." *See Ridge Oil,* 148 S.W.3d at 157. Coastal produced no evidence at trial to prove that its development of Share 13 was delayed by the "judicial determination of the controversy." In fact, the evidence shows the opposite: Coastal continued to develop Share 13 after *Garza I* was filed and increased development substantially after *Garza II* was filed. Because Coastal failed to produce any evidence showing that its delay in developing Share 13 was related to appellees' alleged repudiation, the trial court did not err by refusing to instruct the jury on repudiation. *See* Tex.R. Civ. P. 278. Coastal's twelfth issue is overruled.

### IX. Attorneys' Fees

Coastal's thirteenth issue argues that appellees' award of attorneys' fees must be reversed and remanded based on their expert's admission that he could have, but failed to, segregate attorneys' fees between recoverable and unrecoverable claims.

▮▮▮▮▮ As Coastal points out, appellees cannot recover attorneys' fees for either their trespass claim or their claim for breach of the implied covenant to market, for which the jury awarded no damages. *See Green Int'l v. Solis,* 951 S.W.2d 384, 390 (Tex.1997) (holding that breach-of-contract claimant was not entitled to attorney's fees because jury awarded zero damages); *Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture,* 50 S.W.3d 531, 550 (Tex.App.-El Paso 2001, no pet.) ("attorney's fees are not recoverable in tort actions"). To ensure Coastal was not charged for attorneys' fees which are unre-

coverable, appellees were required to segregate their attorneys' fees between claims on which fees could be recovered and those on which fees could not be recovered. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex.1991) ("In order to show the reasonableness and necessity of attorney's fees, the plaintiff is required to show that the fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees."). A recognized exception to this duty to segregate arises when the attorneys' fees are incurred in connection with claims arising out of the same transaction and are so interrelated that their "prosecution or defense entails proof or denial of essentially the same facts." *Id.* at 11. Therefore, when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are "intertwined to the point of being inseparable," the party suing for attorneys' fees may recover the entire amount covering all claims. *Id.*

Attorney Michael Jones, appellees' expert on attorneys' fees, testified at trial that it was "not impossible" to segregate attorneys' fees in this case:

Q. [By Coastal's counsel] Mr. Jones, is it your testimony that it is impossible for you to segregate the amount of attorney's fees that you have spent or incurred in prosecuting the claims for bad faith pooling?

A. No, I could probably—I could probably get to those. I was thinking more about the subsurface trespass and implied covenant to protect. Those are kind of inextricable. But perhaps the bad faith pooling.

Q. And is it your testimony that you're unable to segregate the amount of attorney's fees that you have incurred in prosecuting the claims for subsurface trespass from the other claims in this lawsuit?

A. Very few things are impossible—and I'm not saying that's impossible, but the amount of time and the effort would be—and a lot of judgment calls and some people would say, yeah, that should be excluded and others would say, no, it shouldn't so—

Q. So it is not impossible, it is just a time-consuming process?

A. Yes, sir.

After reviewing the record, we conclude that attorneys' fees incurred on appellees' claim for breach of the implied covenant to market should have been segregated from the fees incurred on the other claims for which attorneys' fees were recoverable. We further conclude that appellees' trespass claim and claim for breach of the implied covenant to protect against drainage are inseparably intertwined because they involved proof of essentially the same facts (i.e., Coastal's drainage of Share 13 gas and gas condensate by hydraulic fracture stimulation treatment of a well located on Share 12). Accordingly, the attorneys' fees incurred on appellees' trespass claim were not subject to the segregation rule. *See id.*

We sustain Coastal's twelfth issue in part and remand the cause to the trial court for a proper determination of attorneys' fees. *See Stewart Title*, 822 S.W.2d at 11. The trial court is instructed to segregate attorneys' fees incurred on appellees' claim for breach of the implied covenant to market from the attorneys' fees incurred on appellees' other claims.

## X. Prejudgment Interest

■ In its fourteenth issue, Coastal argues that this Court should modify the judgment to reflect the accurate interest rate under House Bill 4, which reduced the post-judgment interest rate from ten per-

cent per year to the prime rate or, if the prime rate is lower than five percent, to five percent per year. *See* Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 6.01. According to House Bill 4, the change applies to all judgments that are "subject to appeal on or after the date of this Act." Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 6.04. Coastal argues that the judgment in this case was "subject to appeal" on September 1, 2003, and thus, the judgment is inaccurate as to the post-judgment rate.

The final judgment in this case was signed on December 17, 2001. As this Court has explained previously, the language "subject to appeal" used by House Bill 4 means that the judgment "fully and finally disposes of all parties and all issues before the trial court and therefore is capable of being appealed." *In re Kajima Int'l, Inc.*, 139 S.W.3d 107, 117 (Tex.App.-Corpus Christi 2004, orig. proceeding). The judgment in this case was neither "signed" nor "subject to appeal" on or after the effective date of House Bill 4. In fact, the appeal was pending in this Court on the effective date of House Bill 4. Consequently, the post-judgment interest rate prescribed by House Bill 4 is inapplicable. Coastal's fourteenth issue is overruled.

## XI. Conclusion

We reverse the trial court's judgment regarding attorneys' fees and remand that issue to the trial court for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.